# EXHIBIT A

{1108.001-W0054502.}

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>Hudson 1701/1706, LLC, *et al.*,[1]<br><br><br>Debtors. | Chapter 11<br><br>Case No. 25-11853 (KBO)<br><br>(Jointly Administered)<br><br>**Related Docket No. 344** |

**ORDER GRANTING DEBTORS' MOTION FOR AN ORDER DETERMINING THAT PURPORTED GROUND LEASE, IF A TRUE LEASE, IS A LEASE OF RESIDENTIAL REAL PROPERTY UNDER SECTION 365 OF THE BANKRUPTCY CODE**

Upon the motion (the "**Motion**")[2] of the above-captioned Debtors, for entry of an order determining that the purported ground lease between the Debtors and 356W58 Ground Lessor LLC dated May 4, 2022 (the "**Purported Ground Lease**"), if deemed a true lease, constitutes a lease of residential real property and not nonresidential real property under Section 365 of the Bankruptcy Code, all as more fully set forth in the Motion; the Court having found that (i) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, (ii) venue for these matters is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409, (iii) this is a core proceeding pursuant to 28 U.S.C. § 157(b); (iv) notice of the Motion was sufficient under the circumstances, and no further or other notice is required; and (v) a reasonable opportunity to object or be heard regarding the relief requested in the Motion has been afforded to all interested persons; the Court having determined that the relief requested in the Motion is in the best interests of the Debtors, the Debtors' estates, their creditors and other parties in interest and that the legal and

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Hudson 1701/1706, LLC (0281) and Hudson 1702, LLC (0190).  The Debtors' headquarters and the mailing address for the Debtors is 11440 San Vicente Boulevard, 2nd Floor, Los Angeles, CA 90045.

[2] All capitalized terms not otherwise defined herein shall have the same meanings ascribed to them in the Motion.

factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that sufficient notice of the Motion has been given; and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED THAT:**

1.  The Motion is GRANTED as set forth herein.

2.  The Purported Ground Lease regarding the property at 353-361 West 57th Street, if it is a true lease, constitutes a lease of "residential real property," as that term is used in Section 365(d)(2) of the Bankruptcy Code.

3.  If it is a true lease, Section 365(d)(2) of the Bankruptcy Code is applicable to such Purported Ground Lease rather than sections 365(d)(3) and (4) of the Bankruptcy Code.

4.  Nothing in this Order shall be deemed to (i) authorize an assumption, rejection or assignment of the Purported Ground Lease, or (ii) determine whether such Purported Ground Lease is an unexpired lease of real property.

5.  Nothing in this Order, the Motion, or the Debtors' actions in connection herewith shall constitute an admission by any party, including the Debtors, the DIP Lender, or the Prepetition Secured Parties, as to whether the Purported Ground Lease is a "lease" for purposes of section 365 of the Bankruptcy Code.

6.  The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order.

7.  The Court shall retain jurisdiction with respect to any matters, claims, rights or disputes arising from or related to this Order.

Dated: April 22nd, 2026
Wilmington, Delaware

KAREN B. OWENS
CHIEF JUDGE

- 2 -

# EXHIBIT B

1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | . | Chapter 11 |
| | . | Case No. 25-11853 (KBO) |
| HUDSON 1701/1706, LLC, | . | |
| *et al.,* | . | (Jointly Administered) |
| | . | |
|     Debtors. | . | |
| | . | |
| . . . . . . . . . . . . . . | . | |
| | . | |
| HUDSON 1701/1706, LLC, A | . | Adversary Proceedings |
| DELAWARE LIMITED LIABILITY | . | No. 25-52471 (KBO) |
| COMPANY; AND HUDSON 1702, | . | |
| LLC, A DELAWARE LIMITED | . | |
| LIABILITY COMPANY, | . | |
| | . | |
|     Plaintiff, | . | |
| | . | |
| v. | . | |
| | . | |
| 356W58 GROUND LESSOR LLC, | . | |
| A DELAWARE LIMITED | . | |
| LIABILITY COMPANY, | . | Courtroom No. 3 |
| | . | 824 Market Street |
|     Defendant. | . | Wilmington, Delaware 19801 |
| | . | |
| | . | Tuesday, April 21, 2026 |
| . . . . . . . . . . . . . . | . | 11:01 a.m. |

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE KAREN B. OWENS
CHIEF UNITED STATES BANKRUPTCY JUDGE

Audio Operator:          Jadon Culp, ECRO

Transcription Company:   Reliable
                         The Nemours Building
                         1007 N. Orange Street, Suite 110
                         Wilmington, Delaware 19801
                         Telephone: (302)654-8080
                         Email: gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

APPEARANCES:

For the Debtors:                William E. Chipman Jr., Esquire
                                CHIPMAN BROWN CICERO & COLE, LLP
                                Hercules Plaza
                                1313 North Market Street
                                Suite 5400
                                Wilmington, Delaware 19801

                                -and-

                                Robert D. Gordon, Esquire
                                Michael M. Fay, Esquire
                                Sabina Mariella, Esquire
                                BOIES SCHILLER & FLEXNER, LLP
                                55 Hudson Yards
                                20th Floor
                                New York, New York 10001

For 356W58 Ground
Lessor, LLC:                    Kirk L. Brett, Esquire
                                Patrick O'Connor, Esquire
                                ADLER & STACHENFELD, LLP
                                555 Madison Avenue
                                6th Floor
                                New York, New York 10022

For the Official
Committee of
Unsecured Creditors:            Thomas R. Hooper, Esquire
                                Catherine V. LoTempio, Esquire
                                SEWARD & KISSEL, LLP
                                One Battery Park Plaza
                                New York, New York 10004

For Parkview
Financial REIT, LP:             David P. Simonds, Esquire
                                HOGAN LOVELLS US, LLP
                                1999 Avenue of the Stars
                                Los Angeles, California 90067

3

INDEX

MOTIONS:                                                                PAGE

Agenda
Item 1:    Motion for Entry of an Order Authorizing              6
           Debtors to Assume Fitness International,
           LLC Retail Lease
           [Docket No. 265; Filed January 16, 2026].

           Court's Ruling:                                       --

Agenda
Item 2:    Debtors' Motion for an Order Determining That        12
           Purported Ground Lease, if a True Lease, is a
           Lease of Residential Real Property Under
           Section 365 of the Bankruptcy Code
           [Docket No. 344; Filed February 24, 2026].

           Court's Ruling:                                       67

Agenda
Item 3:    Letter to The Honorable Karen B. Owens from          70
           the Official Committee of Unsecured Creditors
           regarding the Debtors' Confidentiality
           Designations
           [Docket No. 391; Filed March 25, 2026].

           Court's Ruling:                                       160

Agenda
Item 4:    Motion of the Debtors to Increase DIP               87
           Commitment and Modify and Extend Approved DIP
           Budget Under Final DIP Order
           [Docket No. 400; Filed April 7, 2026].

           Court's Ruling:                                       110

Agenda
Item 5:    Hudson 1701/1706, LLC, et al., v. 356W58           113
           Ground Lessor LLC; Adv. Pro. No. 25-
           52471 (KBO)

           Court's Ruling:                                       160

4

INDEX

WITNESSES CALLED
BY THE DEBTORS:                                              PAGE


      GLENN BRILL

         Direct examination by declaration              --

         Cross-examination by Mr. O'Connor              19

         Examination by the Court                       25

         Redirect examination by Ms. Mariella           29


      ABRAHAM KOHN

         Direct examination by declaration              --

         Cross-examination by Mr. Brett                 36

         Redirect examination by Mr. Fay                53


DECLARATIONS:                                                PAGE

1 - Declaration of Glenn Brill                           17

2 - Declaration of Abe Kohn                              36

3 - Declaration of Alan Tantleff                         98


Transcriptionists' Certificate                          161

(Proceedings commence at 9:33 a.m.)

(Call to order of the Court)

THE COURT:  Good morning, everyone.  Nice to see you.  Please be seated.

Mr. Chipman.

MR. CHIPMAN:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. CHIPMAN:  It's good to see you.

THE COURT:  Good to see you.

MR. CHIPMAN:  Your Honor, before we get started, I'd like to make a few introductions just to reintroduce some people --

THE COURT:  Sure.

MR. CHIPMAN:  -- to the court.

In the courtroom today, we have Andrew Hinkelman, Alan Tantleff, they're the co-CROs of the debtors.

THE COURT:  Nice to see you.

MR. CHIPMAN:  I believe, on the Zoom, there's Ms. Itkin, she's the independent manager, she's on Zoom today.

THE COURT:  Okay.

MR. CHIPMAN:  We have our co-counsel, who you'll get to meet.

Glenn Brill is in the courtroom, he's going to be one of the witnesses today.

THE COURT:  Okay.

MR. CHIPMAN:  And we have another witness who has missed his train from New York.  He's on his way.  He'll be here at 10 a.m. Okay.

THE COURT:  Okay.

MR. CHIPMAN:  Mr. Olivere is going to meet him downstairs.

THE COURT:  Is that Mr. Kohn?

MR. CHIPMAN:  Yes, Mr. Kohn.

Okay.  So, Your Honor, what we propose to do is go in the order of the agenda today.

THE COURT:  Okay.

MR. CHIPMAN:  The first matter is the motion for entry of an order authorizing the debtors to assume the L.A. Fitness lease.  That matter has been adjourned again.

And just to give Your Honor an update of where we are, the debtors are -- as you saw in the DIP budget, we're still funding the construction of that.

THE COURT:  Yes.

MR. CHIPMAN:  Everybody wants us to assume this lease.

There's three issues that we're trying to solve from the prior owners that are cure issues, and they relate to some of the construction that's going on at the property. L.A. Fitness' counsel wants us to put those cure items in the form of order.

THE COURT:  Uh-huh.

MR. CHIPMAN:  We're just trying to still make sure that we can actually perform those cures --

THE COURT:  Sure.

MR. CHIPMAN:  -- satisfactory to L.A. Fitness, so the parties continue to talk.

And it relates to an elevator, it relates to a chiller unit, the air conditioning unit in there, whether or not we can refurbish them, or they've got to be new; and, if they have to be new, then it takes a little bit more time to design it and install them.

So that's why that keeps getting continued.  The debtors still intend to assume that lease, but we're still, unfortunately, working through a bunch of cure issues.  So that'll be continued.

And with that, Your Honor, what I'd like to do is cede the podium to Mr. Gordon, who will take Your Honor through the next matter, which is the 365 motion.

THE COURT:  Okay.  We're okay moving forward without the second witness present?

MR. CHIPMAN:  We have --

THE COURT:  We're going to --

MR. CHIPMAN:  -- the first --

THE COURT:  -- accommodate that --

MR. CHIPMAN:  We --

THE COURT:  -- adjournment --

MR. CHIPMAN:  I believe --

THE COURT:  -- of the --

MR. CHIPMAN:  -- counsel --

THE COURT:  -- testimony?

MR. CHIPMAN:  -- counsel for MSP wanted to go out of order.

THE COURT:  Uh-huh.

MR. CHIPMAN:  We think it makes sense to go in order just because of the way the agenda is set up.

We do have our first witness here.

THE COURT:  Okay.

MR. CHIPMAN:  And I think he's only about 20 minutes away.  So --

THE COURT:  All right.

MR. CHIPMAN:  -- if we have to take a short break, I would just suggest we take a short break and allow him to get here after we do the first witness.

THE COURT:  That would --

MR. CHIPMAN:  That was --

THE COURT:  I'd like to --

MR. CHIPMAN:  -- our thought.

THE COURT:  Okay.  I'd like to proceed in that fashion.  It doesn't seem like we'll have -- be delayed too much since he's on the train --

MR. CHIPMAN:  Well, he --

THE COURT:  -- correct?

MR. CHIPMAN:  He's driving, he's almost here.

THE COURT:  Oh, he's driving.

MR. CHIPMAN:  Yeah.  Mr. Olivere is in contact with him.  He's about 20 minutes away.

THE COURT:  Okay.  No need to rush.  We don't need any accidents.  So we'll accommodate whatever it takes for him to get here.

MR. CHIPMAN:  I appreciate that, Your Honor.

THE COURT:  Okay.

MR. BRETT:  Well, I think -- Your Honor, my name is Kirk Brett, I'm here with my colleague Pat O'Connor.  And of course, our star is from Delaware --

THE COURT:  Mr. McGuire.

MR. BRETT:  -- Mr. McGuire and Ms. Dute.

So we were planning on handling a cross-examination of Mr. Kohn, and it was tentative whether we would do a cross-examination of Mr. Brill --

THE COURT:  Okay.

MR. BRETT:  -- which is why we suggested that perhaps we give a little extra time and handle something else out of order --

THE COURT:  Uh-huh.

MR. BRETT:  -- in order to have Mr. Kohn appear.

Your Honor has ruled, I respect it.  I just wanted you to understand why we were suggesting what we were, in terms of the agenda items.

THE COURT:  Well, are you or are you not going to cross-examine the first witness?  We're here, so you should know.

MR. BRETT:  Well, since we're here and since we're doing it that way, yes, we will cross-examine Mr. Brill.

THE COURT:  Okay.  Well, then let's move forward.

MR. BRETT:  Okay.

THE COURT:  If you weren't going to cross-examine the first witness, then we need to adjourn until Mr. Kohn gets here.

MR. BRETT:  Right.  It was tentative because, from our perspective, it depended upon the way in which Mr. Kohn would testify.  So it's fine with us to proceed, Your Honor.  I'm not standing in the way, but just --

THE COURT:  Okay.

MR. BRETT:  Okay.

THE COURT:  All right.  Do we intend to put Mr. Brill on first then, or what's the debtors' method of presentation today --

MR. CHIPMAN:  Yeah.

THE COURT:  -- order of --

MR. CHIPMAN:  Your Honor --

THE COURT:  -- presentation.

MR. CHIPMAN:  -- we intend to go in the order of the agenda.  That's the way we set up the hearing today.  We think that the two witnesses kind of -- their testimony is going to be applicable to everything that follows.

So I think what -- we start with Mr. Brill and then --

THE COURT:  Okay.

MR. CHIPMAN:  -- if we aren't -- if we're done before 10 or 10:05, when he get -- when Mr. Kohn gets here, we can maybe take a short adjournment while we allow Mr. Kohn to get here, get settled.

THE COURT:  Perfect.

MR. CHIPMAN:  But I think we should use the next 20 minutes to start the motion.  Okay.

THE COURT:  Okay.

MR. CHIPMAN:  Thank you.

THE COURT:  Good morning.

MR. GORDON:  Good morning, Your Honor.

THE COURT:  Nice to see you.

MR. GORDON:  For the record, Robert Gordon of Boies Schiller Flexner on behalf of the debtors.

In the courtroom, also from Boies Schiller, are my partners Michael Fay and Sabina Mariella and Associate Virginia Su.

THE COURT:  Welcome, everyone.

MR. GORDON:  Your Honor, I will just lay a quick foundation or -- of how we got from March 12th to here, and then defer to my partner Michael Fay and to Sabina Mariella to take you through the evidentiary issues.

Before we begin, as a threshold housekeeping matter and for clarity of the record, the purported ground lessor, who is the party opposing the debtors' motions and who is the defendant and the debtors' adversary proceeding seeking to recharacterize the lease as a financing, is called 356W58 Ground Lessor LLC, which is a mouthful.  So, for the record, we will be referring to the lessor simply as "MSP," which is the acronym for Montgomery Street Partners, the ultimate parent of the lessor.

Your Honor, the first item on the agenda for today is a continuation of the hearing regarding the debtor's motion for an order determining that the purported ground lease between the debtors and MSP, if deemed a true lease, constitutes a lease of residential real property and not of non-residential real property under Section 365 of the Bankruptcy Code.

The determination sought in the motion is of critical importance in providing clarity to the debtors regarding the timing of their obligations to assume or reject the purported lease, if a true lease, under Section 365.

13

As the Court will recall, on January 27th, the debtors filed a motion to extend the deadline for assumption or rejection under 365(d)(4) for 90 days to May 20th.  And the Court entered an order granting that relief on February 9th, Docket Number 308, with no objections having been interposed.

Both the motion and the order explicitly state that, among other things, the issue of whether the property is residential or non-residential for purposes of Section 365 is preserved.  If Section 365(d)(4) is applicable here, no further extension of the May 20 deadline can be obtained by the debtors without the consent of MSP.

As we pointed out at the March 12 hearing, Your Honor, in determining whether a lease is a lease of residential or non-residential real property, a significant majority of courts have looked to the nature of the use of the property or the so-called "property test."

In our motion, we spend time going through the factors recently identified by Bankruptcy Judge Deller in the In Re Guardian Elder Care case at 665 B.R. 270, a 2024 case from the Western District of Pennsylvania, in which Judge Deller outlines a six-point totality of the circumstances test, which I would submit is really an elaboration or a further articulation of the property test.  I will just briefly summarize our treatment of those factors.  For good

measure, we went through each of the six factors:

One is the primary use of the property.

Two is the intended purpose as expressed in the lease.

Three is the nature of the occupancy by residents.

Four is applicable regulatory requirements.

Five is the economic and commercial aspects of the lease.

And six is the legislative history of Section 365.

On March 12, we argued before the Court, and continue to assert, that the fact that the property serves as a residence for 29 tenants, and that the lease explicitly provides that the property be developed primarily for residential purposes clearly satisfy the first three elements.

As to the fourth element regarding applicable regulatory requirements, we argued and continue to argue that the fact that the New York City Department of Housing Preservation and Development exercises jurisdiction over the property satisfies this factor.

The fact is that the lease contemplates that the primary use of the property is for multifamily residential purposes satisfies the fifth factor regarding the commercial aspect of the lease.

Finally, as to the sixth factor, looking to the

legislative history, we noted and continue to note that the provisions of Section 365(d)(3) and (4) were incorporated into the Bankruptcy Code in 1984 out of a concern for landlords of shopping centers.  And while those provisions may apply to other commercial properties and not just shopping centers, those statutory provisions do not use the term "commercial property" and, therefore, clearly do not apply to all commercial property, only non-residential real property.  Thus, since the property is not intended to be used -- thus -- I'm sorry.  Thus, for use as a non-residential commercial property, the legislative history indicates that the property should be deemed residential for purposes of Section 365.

At the conclusion of the hearing on March 12, the Court indicated several things:

First, the Court determined that the debtors had, as a procedural matter, properly brought the matter before the Court pursuant to motion practice.

Second, the Court stated that it would adopt the totality of circumstances test for determining the nature of the real property, as articulated by Judge Deller in the Guardian Elder Care case.

Third, the Court expressed concern about the possibility that, if the debtors were successful in recharacterizing the lease as a financing, that the debtors

may have the intent to then, free of the strictures of a lease that is no longer a lease, pivot from the contemplated residential development under the lease to a use that does not fall under Section 365(d)(2), but under Section 365(d)(4) of the Bankruptcy Code.  Accordingly, the Court asked for greater clarity on that issue, precipitating the evidentiary hearing we're having this morning.

And with that background, Your Honor, I would like to turn over the podium to my partners to proceed.

THE COURT:  Thank you.

MR. GORDON:  Thank you.

THE COURT:  Appreciate that background.

MR. GORDON:  Thank you.

MR. FAY:  Thank you, Your Honor.  Michael Fay for the debtors.

In response to Your Honor's request at the last hearing, we have two witnesses we're going to offer today.

THE COURT:  Okay.

MR. FAY:  We have agreed with counsel for MSP that the declarations will be used as the direct, and we would offer that into the record.

THE COURT:  Okay.  Are you going to -- do you intend to supplement any of the testimony?

MR. FAY:  No, we do not, Your Honor, not today. We will make them available for cross and any questions that

the Court might have.

THE COURT:  Okay.

MR. FAY:  Okay.

THE COURT:  All right.  Should we take -- well, let's take them one by one then.

MR. FAY:  Okay.  The first witness we would call is Mr. Glenn Brill.  Mr. Brill is a managing director of the real estate -- of real estate solutions at FTI.  And as his declaration makes clear, he has knowledge about this project and what's being done there.

THE COURT:  Okay.  Does anyone object to the admission of Mr. Brill's declaration as his direct testimony today?  Subject to cross-examination.

(No verbal response)

THE COURT:  All right. Hearing no objection, it is admitted.

(Brill Declaration at ECF 396 received in evidence)

THE COURT:  You intend to cross-examine Mr. Brill?

MR. BRETT:  Yes, Your Honor --

THE COURT:  Okay.

MR. BRETT:  -- we do.

THE COURT:  Mr. Brill, why don't you step forward?  Enter our witness box and remain standing, sir, so that you can be sworn in.  It's right there.

Before you're sworn in, we need to move

18

everybody -- the many folks that are listening today, by Zoom into the waiting room.  Once we've done that, we'll swear you in.

(Pause in proceedings)

THE COURT OFFICER:  Please raise your right hand.

GLENN BRILL, WITNESS FOR THE DEBTORS, AFFIRMED

THE COURT OFFICER:  All right.  Please state your full name and spell your last name for the record.

THE WITNESS:  Glenn Brill, B-r-I-l-l, Glenn with two Ns.

THE COURT OFFICER:  All right.  Thank you.  You may be seated.

THE WITNESS:  Thank you.

Good morning, Your Honor.

THE COURT:  Good morning.  Thank you for taking the time to appear today.

MR. O'CONNOR:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. O'CONNOR:  My name is Patrick O'Connor of Adler Stachenfeld, and I represent 356W58 Ground Lessor LLC, which I'll refer to this morning as "the landlord."

THE COURT:  Okay.

(Laughter)

THE COURT:  I'll call them "the ground lessor," so we'll have three different names.

MR. O'CONNOR:  That's fine.

(Laughter)

THE COURT:  Okay.

CROSS-EXAMINATION

BY MR. O'CONNOR:

Q     Good morning, Mr. Brill.  It's nice to see you again.

A     Good morning.

Q     Mr. Brill, how many SRO units are in the building?

A     Thirty-two.

Q     And what is the combined square footage of the SRO units?

A     I believe approximately 7,400 square feet.

Q     And what is the total square footage of the entire building?

A     The entire building is 410,000 square feet, of which 210,000 is the net rentable residential square footage.

Q     Under what circumstances may SRO occupants be evicted?

A     Well, that is a matter for Housing Court.  There's a variety of reasons; certainly non-payment of rent, illegal use of the unit come to mind.

Q     Are any of the SRO occupants not paying their rent or past due on their rent?

A     Perhaps -- perhaps one.

Q     And are any of the SRO occupants using their units illegally?

A    Not to my knowledge.

Q    So are there any eviction proceedings concerning any of the SRO occupants presently?

A    There is one matter that's being taken up in Circuit Court in New York, whereby one of the residents has passed, and we are in Circuit Court to recapture the unit.

Q    Is that the only unit?

A    To my knowledge.

Q    So is it fair to say that the SRO occupants that the debtors inherited are not going anywhere?

A    Not unless they choose to, or if they pass away.

Q    Your declaration states that you expect the New York City Department of Housing Preservation and Development will approve the debtors' cure application.

When do you expect that that will happen?

A    Well, we recently received a communication from Joe Restuccia, he is the Executive Director of Clinton Housing, he is also a member of Community Board 4.  And in his summation, he recommended that we have a meeting with Housing Preservation and Development in May, and that he would expect the agreement to be signed in June.

Q    But the agreement has not been signed yet, correct?

A    Not to date.

Q    And is that the best case scenario, that June would be the earliest that the cure agreement would be signed?

A    I think it's a reasonable scenario.

Q    Are there any stop work orders impacting the building?

A    Yes.

Q    How many?

A    Two.

Q    And are the debtors permitted to perform any renovations at the building while these two stop work orders are in effect?

A    Not as they relate to the -- the larger project, as it was planned and approved by the Department of Buildings.

Q    But Mr. Brill, are they -- are the debtors allowed to pursue any renovations at the building?

A    They can do emergency repairs, but renovations, I would say no.

Q    Okay.  Are the debtors allowed to pursue modernization or renovation construction to the elevators while the stop work orders are in effect?

A    I would say that's a yes-or-no answer, whereby, if the Department of Buildings perceives that those improvements would contribute to the larger project, the answer would be no, whereby the Department of Buildings, effectively, is the police powers of HPD.  They enforce HPD mandates, edicts, however you want to -- decisions, however you describe them.

Q    Okay.  But have the debtors attempted to pursue that renovation work?

A       No.

Q       Okay.  Do the stop work orders prevent the debtors from carrying out their long-term plans to upgrade the boiler at the building?

A       Again, similar circumstances.  If -- I believe, if that work was perceived as part of the larger project to convert the project -- the building to a multifamily use, I think, in all likelihood, the answer would be no.

Q       But again, the debtors have not attempted to pursue their long-term plans to upgrade the boiler, right?

A       Well, the boiler was not initially part of the project plan.  And the -- it's really only recently been understood that there's more work to be done there.

Q       Okay.  But if it's outside the scope of the original project plan, then isn't it not impacted by the stop work order?

A       Well, again, I believe it is because it contributes to the larger plan.  The boiler is operational today.

Q       Your declaration references an estimate to -- of the total costs to complete the project, correct?

A       Correct.

Q       What is that estimate?

A       The estimate is approximately $100 million for the hard and soft costs related to the plan that was put in place by CSC.

23

Q     Okay.  Are you aware that Mr. Kohn's declaration estimates that the costs to complete the project are $68 million?

A     I am not aware.

Q     I think you and I discussed this subject in your deposition on Friday.  Do you recall that?

A     Yes.

Q     Do you recall that we discussed the sixty-eight-million-dollar estimate in Mr. Kohn's declaration?

A     No.

Q     Your estimate of $100 million to complete the project, that includes the owner's contingency?

A     Yes.

Q     It includes the owner's allowance?

A     Yes.

Q     Does it include the costs to replace the boiler?

A     Yes.

Q     Does it include the costs to upgrade the elevators?

A     Yes.

Q     Does it include the costs to repair the roof?

A     Yes.

Q     Does it include costs to replace or renovate the common area HVAC system?

A     Yes.

Q     Does it include carry costs?

A    No.

Q    Does it include real estate taxes?

A    No.

Q    Does it include financing costs?

A    No.

Q    Okay.  So inclusive of all of the categories that we just discussed, what do you estimate that the costs to complete the project are?

A    Well, again, $100 million, approximately, plus those carry costs, as you described them.  And I have not estimated those costs at this time.

Q    Okay.  And are there open violations at the property presently?

A    Yes.

Q    And how would the debtors go about curing those violations?

A    Largely, they have to pay the fines.

Q    And have the debtors done so?

A    No.

MR. GORDON:  Okay.  I have nothing further.

Thank you, Mr. Brill.

THE COURT:  Thank you very much.

Mr. Brill, before I tender you for redirect, let me ask you a question.  And then you're permitted to follow up on my questions to the extent you'd like.

MR. O'CONNOR:  Thank you.

THE COURT:  And then I'll turn the podium over to the debtors.

EXAMINATION

BY THE COURT:

Q    In your declaration, Mr. Brill, you state that there are two regulatory authorities that have oversight of the stop work order, the New York Department of Housing Preservation and Development and the Department of Buildings.

Do you recall that testimony?

A    Yes, Your Honor.

Q    Okay.  And that's a true statement, to the --

A    Yes.

Q    Okay.  Are there any other regulatory authorities that are overseeing or are regulating the building at this time?

A    No, Your Honor.

Q    Okay.  If the debtor were to start developing the residential -- or the larger plan, what -- tell -- talk to me about who would be overseeing that from the regulatory standpoint.  Is it the Department of the HPD, or are they unique to the fact that there are these S-O-R [sic] tenants located --

A    Well --

Q    -- in the building?

A    Well, there's two -- there's two aspects there.  And

far as the actual construction --

Q      Uh-huh.

A      -- that would be the Department of Buildings.

Q      Okay.

A      HPD would inspect the H-P -- the cure units, the 138 units, to make sure that they are built to the agreed upon specifications in the cure agreement.

Q      Okay.  So that -- so the HPD and the Department of Buildings are not unique regulatory authorities to the SRO issues, or I should say only focused on the SRO issues. They're focused on the project as a whole, and one subset would be the SRO tenant oversight.

A      Well, with respect to the Department of Buildings, they're focused on the overall project.

Q      Uh-huh.

A      The HPD, they're focused on the execution of the cure agreement --

Q      Okay.

A      -- which is to say the 138 units are built and built to certain specifications as agreed upon in the cure agreement.

Q      And when you refer to the "cure agreement," refresh my recollection on what that is.

A      The cure agreement is -- is a letter agreement between the developer, the sponsor, the debtor, and Housing Preservation and Development.  And it specifies the terms

of -- of that particular -- you know, of the cure, which is 28 percent of the residential area needs to be dedicated to permanent affordable housing.

Q    Okay.

A    And also in the cure is a set of specifications for those units, in terms of size and finish and things of that nature.

Q    And just because I'm not a hundred -- I'm not in it like you are, so I don't understand all the ins and outs. But --

A    Sure.

Q    -- I was under the impression that the stop work order, or at least the focus of the presentations on the stop work order, one of them has been because of the SRO tenants, that there was a stop work order that arose because of the SRO tenants.

A    Well, the stop work order, as I -- and this -- the stop work order predates my involvement.

Q    Uh-huh.

A    My -- my understanding is, on a technical basis, the developer violated his permits.  So they review the permits, they look at the permit in relation to the work, and -- and their determination is you're doing things that were not permitted.  So that -- that's a basis for stopping it.

But once the -- again, the Department of Buildings,

they effectively are police powers for HPD.  So, when HPD makes a decision, it gets handed to the Department of Buildings and they enforce it.

And clearly, in order to enact a multifamily project, you need a certificate of no harassment.  And one was not granted and here we are.

Q     So the cure agreement dovetails with the issues that were -- arose because of the SRO tenants and what they were entitled to.

A     Well, I think the -- the cure agreement is -- is a statutory provision.  New York -- New York City has three so-called "special districts" in the entire city.  And part of the enactment of those special districts is the enforcement of the certificate of no harassment, which is to say, if you are going to go into a residential building and start making wholesale renovations, you know, the assumption is that many of the tenants are long term, they're there under rent stabilization laws, and it is to prevent the developer from harassing the tenants out of the building.

And it's not necessarily SRO tenants.  It could be any tenant, really.

Q     Okay.

A     But you know, unfortunately, that has occurred over time.

So it's not uniform throughout the city; again, it's

only in three special districts.

Q    Okay.  And that led to the conclusion of the -- well, that gave raise -- rise to the permitting violations.

A    In part.  And it's certainly the reason why the project cannot be restarted.

Q    Okay.  That's helpful.  Thank you.

So, besides the HPD and the Department of Buildings, is there any other regulatory authority that you know of that you're interacting with or parties at FTI or any other debtor professionals interacting with currently?

A    Not to my knowledge.

Q    Okay.  All right.  Thank you very much.  That's helpful.

A    You're welcome.

THE COURT:  And do you have any follow-up cross based on my questioning?

MR. O'CONNOR:  I have no further questions, Your Honor.

THE COURT:  Okay.

MR. O'CONNOR:  Thank you.

THE COURT:  Thank you so much.

MR. O'CONNOR:  Thank you.

REDIRECT EXAMINATION

BY MS. MARIELLA:

Q    Mr. Brill, just to pick up on that line of questioning

from the Court.  The cure agreement is what's -- once the cure agreement is executed, your understanding is that the stop work orders will be lifted, right?

A     That's correct.

Q     And the cure agreement has two main components, right? The agreement with HPD and the cure agreement that there will be a certain number of affordable housing units in the building, right?

A     Correct.

Q     And an agreement about what will happen to the SRO tenants while construction -- when construction resumes, right?

A     Correct.

Q     What's the status of that first piece, the agreement surrounding the number and the specification for the affordable housing units?

A     The number of units and the specifications for those units has been agreed upon.

Q     And then what's the status of that second piece of the cure agreement, the relocation of the SRO tenants during construction?

A     I would say it is very nearly completed.  Again, Mr. Restuccia, who is really the point person on behalf of the community board -- Clinton Housing is a non-governmental organization that's dedicated to tenant rights and the

creation of affordable housing -- he believes that a meeting with HPD again in May will result in an executed agreement in June.

And in that regard, Mr. Restuccia, again, he sits on the community board, Community Board 4.  And the community board issued, effectively, a letter of endorsement and, in the process of doing that, CCed the elected officials that have been involved to date, the council person.

And we think that's a very positive development in terms of -- you know, it is a bureaucracy.  And when interested stakeholders, influential stakeholders pick up the phone and ask what's going on, what are you folks doing over there, that's helpful.

Q    Okay.  So is it fair to say that, based on your experience with this project, at this point, you're pretty close to getting the cure agreement signed and the stop work orders lifted?

A    Yes.

Q    Okay.  As to the SRO tenants, it is true that they're not going anywhere unless they choose to or they pass away, right?

A    Correct.

Q    Does that fact that they're not going anywhere make it hard to make this building into something other than an apartment building?

A      Yes.

Q      Why?

A      Well, I -- it's a question of compatibility.  I mean, there's -- there's a number of reasons why this building is really only suited to multifamily redevelopment.  But certainly, the presence of -- of the SRO tenants narrow -- narrows down the possibilities in any event, for obvious reasons.

       For instance, in an office-type situation, you'd have to be able to segregate out two populations.  You have a transient population of office workers and visitors and you have the permanent residents.  So there are issues of security, which don't necessary -- you know, I think from an office tenant's perspective, you don't necessarily want your -- your employees or your visitors interacting with the tenants for any number of reasons.  And I think, from a tenant's perspective, you certainly wouldn't want to see a lot of transient new faces every day.  You know, it's a question of security, I think, more so than anything else, but also it's a question of appearances.

Q      Let's talk about the elevators.  Is it efficient to make large renovations to the elevators in the building at the moment?

A      No.

Q      Why?

A       Well, the elevators are going to play a role in the larger renovation project, and they are going to take a lot of abuse.  And in that regard, if you are going to modernize them, which is a considerable project that takes time and money, you would wait until the period of abuse is over, and that would be toward the end of the project.

Q       Do construction projects generally have to be sequenced in a way that's efficient and makes sense?

A       Well, they are sequenced, absolutely, for efficiency, for economic efficiency.  And again, you know, the simplest example is something like the elevators, you know, finish work always comes at the end.  You know, there's definitely -- the sequencing of a construction project is critical in relation to the various trades that come through the building, the plumbers, the electricians, the carpenters. All that needs to be very carefully coordinated, again, to achieve efficiency because, if -- if trades are standing around doing nothing, you're paying them, and you don't want that.

Q       Mr. O'Connor mentioned a sixty-eight-million-dollar estimate to complete construction.  You are aware that there is an estimate somewhere in that range.  You've heard that before, right?

A       Yes.

Q       So what's the delta between your $100 million and that

sixty-eight-million-dollar estimate?  Why are you -- why do you have a different number?

A      Well, the $68 million is a component of the larger project, and it's based on the plans that were put together by CSC.  Again, there is additional work that needs to be done.  CSC had planned to reuse a lot of the building's infrastructure, and that infrastructure is just in terrible condition.  Again, the elevators, the boiler, the roof, some of the HVAC equipment, it's all wasted, and that's a lot of -- a lot of money.

The tenant protection plan that's needed to -- it's really needed in twofold, you know, obviously, for the -- the health and welfare of the -- of the tenants, and it's also necessary to reopen the permits.  You have to be able to demonstrate to the DOB that you have an adequate tenant protection plan in place, which we are doing, and that costs money, too.

Q      Mr. Brill, you've been involved with this project since about the end of October.  Is that right?

A      Yes.

Q      Have you ever heard any discussions at all that this project is going to be anything other than an apartment building?

A      No.

MS. MARIELLA:  That's all I have.  Thank you, Your

Honor.

THE COURT:  All right.  Thank you very much.

Mr. Brill, thank you for your time.  You are released from the box.

THE WITNESS:  You're welcome.  Thank you, Your Honor.

MR. O'CONNOR:  May I ask one or two questions, Your Honor, on recross?

THE COURT:  No, I don't allow for recross.

(Participants confer)

MR. FAY:  Your Honor, Mr. Kohn is here, so we would call Mr. Kohn for --

THE COURT:  Okay.

MR. FAY:  -- cross-examination and questions --

THE COURT:  Does he need --

MR. FAY:  -- from Your Honor.

THE COURT:  Does he need few minutes before we go to the witness box?

(Participants confer)

MR. FAY:  Oh, do you want to take -- now?  All right.  Sure.

THE COURT:  No, if Mr. Kohn is great, well, let's continue.

(Participants confer)

MR. FAY:  All right.  Well, if I didn't do it

before, Your Honor, I'd like to move Mr. Kohn's declaration in, as well.

THE COURT:  Okay.  Does anyone object to the admission of Mr. Kohn's declaration subject to cross-examination?

MR. BRETT:  No, Your Honor.

THE COURT:  No.  Okay.

MR. FAY:  Okay.

THE COURT:  It's admitted.

(Kohn Declaration at ECF 397 received in evidence)

THE COURT:  Mr. Kohn, thank you for making it. Please come and stand in the witness box and you'll be sworn in.

THE COURT OFFICER:  Please raise your right hand.

ABRAHAM KOHN, WITNESS FOR THE DEBTORS, AFFIRMED

THE COURT OFFICER:  All right.  Please state your full name and spell your last name for the record.

THE WITNESS:  Abraham Kohn, K-o-h-n.

THE COURT OFFICER:  All right.  Thank you.  You may be seated.

THE WITNESS:  Thank you.

CROSS-EXAMINATION

BY MR. BRETT:

Q     Good morning, Mr. Kohn.

A     Good morning.

Q      It's nice to see you again after our deposition on Friday.

As you may remember, I'm Kirk Brett.  I represent the landlord here or the ground lessor.  And I just want to follow up on a couple of questions that we dealt with during our meeting on Friday.

So, first, who is your employer?

A      Parkview Financial.

Q      Okay.  But you're involved in overseeing the project at the former Hudson Hotel, correct?

A      I was involved prior to the bankruptcy and I continue to work with the FTI team on overseeing day-to-day operations.

Q      Okay.

THE COURT:  Mr. Kohn, can you get closer to the microphone?

THE WITNESS:  Sure.  I'm sorry about that.

THE COURT:  Thank you.

BY MR. BRETT:

Q      And you and Mr. Brill together are overseeing that project, correct?

A      Correct.  With a number of other consultants, as well.

Q      Okay.  I asked you during the deposition how you would characterize the project.  I asked you if it would be fair to refer to it as a "stalled construction project."  Do you

remember how you responded?

A    I don't, to be honest.

Q    Okay.

A    I'm sorry.

Q    Would it be fair to say that it's a stalled construction project?

A    Yes, it would be fair to say.

Q    Okay.  We also talked about the steps required to complete the project --

A    Uh-huh.

Q    -- right?

A    And I think that you said step one was to have the cure agreement signed up with HPD, correct?

A    Correct.

Q    Okay.

A    That's how we would get the stop work order lifted.

Q    And are you aware that a cure agreement requires the signature of the ground lessor?

A    I am.

Q    Okay.  And the next requirement would be the lifting of the stop work order, correct?

A    Correct.

Q    And the next requirement after that would be, I think you characterized it as filing new plans with the DOB?

A    Yes, bringing the design team back on board and filing

the plans to make sure that the current plans reflect exactly what it is that we're looking to do.  Like Mr. Brill said, there are a number of components to the project that we are undertaking that the former borrower was not looking to do.

Q    Okay.  So you have to file those plans and get approval to --

A    It's called a --

Q    -- implement --

A    "post-approval" --

Q    -- those plans.

A    "-- amendment," yeah.

THE COURT:  I'm sorry.  Say that again for the record.

THE WITNESS:  It's called a "post-approval amendment."  It's not a full refiling.  It's just an adjustment to what's already been filed.

BY MR. BRETT:

Q    Okay.  And then I think you mentioned that you have to find a developer, correct?

A    I believe I said we were looking for a developer.  I'm not sure that we need one, but we are looking for one as a partner, yes.

Q    Okay.  Parkview itself is not a developer, correct?

A    Correct.

Q    Okay.  And your understanding is Parkview is looking

now for a developer, correct?

A    We are looking for partners, yes.

Q    For part -- okay.  Partners.

Are those -- what kind of partners?  Are those financial partners, development partners?  What kind of --

A    Both financial --

Q    -- partners --

A    -- and development partners, yes.

Q    Both.

A    Uh-huh.

Q    Okay.  Could they be the same party?

A    Sure.

Q    Okay.  And then, after you find partners, you would engage a general contractor, correct?

A    Correct.

Q    And  --

A    And just to clarify, we're not waiting to find a partner to engage a general contractor.

Q    Okay.  Thank you.

The -- and it's likely the general contractor would be the current pre-construction construction manager, correct?

A    Correct.  That's the plan.

Q    And the --

A    They know most about the project and the scope, and they would be able to start the project more immediately than

any other contractor brought on, in my opinion.

Q     Okay.  And the current pre-construction construction manager is an outfit called DeSimone, correct?

A     DeSimone Construction, yeah.

Q     DeSimone Construction.

      So the general contractor is likely to be DeSimone.

A     As it stands right now, yeah.

Q     Okay.  And then the -- after engaging the general contractor, the general contractor then engages subcontractors, correct?

A     Correct.

Q     And then the subcontractors would then construct, right?  They would do -- work on the project?

A     Yeah.

Q     Okay.  And then, after they are finished constructing, they would ask for approvals or inspections to be performed by the DOB?

A     Approval process happens throughout construction. Prior to them starting to build, there's some middle processes that go for approval.  Throughout construction, there are rough inspections that happen.

      But yes, there is one final temporary certificate of occupancy inspection that is the big inspection that you can now occupy your floors.

Q     Okay.  And that's when you consider the project done,

right?  When you get a temporary certificate of occupancy.

A    Yes.  That means we can -- we can lease out the units.

Q    Okay.  So I think you mentioned that there was an estimate performed or provided of the length of time that the construction project would take?

A    Yes.

Q    Who provided that estimate?

A    DeSimone Construction.

Q    Okay.  And the --

A    As part of their pre-con efforts.

Q    Sorry.  Say it --

A    As part of their pre-construction efforts, the ask was a budget amount and a schedule.

Q    Okay.  And that was my next question.  Thank you.

There was a -- there was budget amount also estimated by DeSimone?

A    Yes.  That was the roughly sixty-eight-million-dollar number.

Q    Okay.  And that's a written document, correct?  The budget and the estimate are in a written document?

A    Yes.

Q    And you're aware that that written document hasn't been provided to anyone in the courtroom, besides the debtors and Parkview, correct?

A    I am -- I'm not aware of that, no.

Q    You're not aware that, for example, the ground lessor has not been provided with the DeSimone report?

A    That I'm aware of.  I -- I understood that the committee was sent the report, but I could be mistaken, I could have misunderstood that --

Q    Okay.

A    -- from our attorneys.

Q    Okay.  So let's go back to the DeSimone report.  And bear with me because I haven't seen it.  But the time frame is how long that DeSimone has estimated would be required to complete the construction project?

A    I believe that they were looking to phase temporary certificate of occupancy.  The first TCO, I believe, was 24 months from start of construction, and the second and last TCO, I believe, was 30 months from start of construction.

Q    Okay.  What was the first one?  Because I only remember you testifying to the thirty-month.

A    The 30 is the total project completion.  But there -- we were looking at having two TCOs, which would enable us to start moving in residents while the final construction was happening on the other floors.

Because of the sequence with our SRO tenants, there are certain floors that we're not going to be able to finish until our SRO residents move from their temporary housing during construction to their permanent housing within the

building.  And once that coordination happens, our construction team would go back and -- and finish everything needed on those floors.  So that's the reason for the two TCOs.

Q    Okay.  And is that described in the DeSimone report that the ground lessor has not seen?

A    I believe so.

Q    Okay.  The budget estimate of $68 million, that's also described in the DeSimone report?

A    Yes.

Q    Okay.  But if we were -- if you were to be gifted -- if the debtors were to be gifted $68 billion tomorrow, that wouldn't be sufficient to complete the project, correct?

A    Correct.  That is the hard cost construction budget only.  That doesn't include carry or ground rent or design professionals or other consultants needed to complete the project.

Q    Okay.

A    So I would say it's the biggest and most important piece of understanding our cost to complete, which is why we engage them, but it is not the full story.  Correct.

Q    Okay.  Does it include -- again, we haven't seen the report.  But does it include work on the elevators?

A    I believe it does.

Q    Okay.  Does it include a replacement of the boiler

system?

A    I don't recall if it's a full replacement or if it's an extensive repair.  I would have to double check that and get back to you.

Q    Okay.  What about roof repairs?

A    I believe it does.

Q    Okay.  Mr. Brill just testified a few minutes ago that the total cost would be about $100 million.  Is that correct?  Well --

A    It's an estimate.

Q    That's an estimate.

It -- I don't mean to suggest is it correct that he testified to that.  I meant do you agree that that is an estimate -- an appropriate estimate.

A    I think, as a holistic budget, 100 million should cover the full redevelopment project, yes.

Q    Okay.  But I think that he also testified that the $100 million does not include carry costs, so --

A    I could be mistaken.

Q    I'm sorry?

A    I could be mistaken, I -- that -- that the hundred does not include carry.  I may have misunderstood that.

Q    Okay.  So, if we include the carry costs, do you have an estimate of how much this project will cost?

A    Probably closer to one twenty-five.

Q     Okay.

A     Again, these are all rough estimates.  We don't have actual pricing for --

Q     Okay.  All right.  So going back to the dollars -- I mean, just to go back to the timing, the 30 months to completion for the second TCO, that's not from today, correct?

A     No, that's from the start of construction.

Q     Okay.  So -- and the start of construction has to await the completion of the cure agreement and the stop work order being lifted and the amended application with the DOB, correct?

A     Yes.

Q     Okay.  So what is your best estimate of when that thirty-month period would start?  When would construction be possible to start?

A     Well, really, first step is having an executed cure, which have been following up on diligently.  And that was submitted in December.  And we are working through a number of relocation agreements for our SRO residents.

      And we had a very productive call yesterday with Joe Restuccia, who Mr. Brill mentioned.  He is the head of Community Board 4.  I believe he told us yesterday that, by 30 to 45 days, we should be able to have that -- an executable draft back from HPD.

We've already explained to HPD that, because of the bankruptcy, it's not going to be able to execute that immediately, this would have to go through legal processes that I'm not super familiar with in order to have a final executed draft.

Q      Okay.  So that's the HPD cure.

A      Yeah.

Q      And then we have additional time for the stop work order and additional time for the amended plans?

A      The amended plans, that would not be additional time. We would be able to mobilize and start construction without those.  The -- the process of a post-approval amendment is you're able to start construction while you're still working through some details.  So that can be filed once construction starts, also.

Q      Okay.

A      But that shouldn't preclude us from starting construction.

Q      Okay.  Yeah, I'm just trying to get an estimate of when construction can start.

So is it six months away?

A      Yeah, I'd say that's a fair --

Q      Okay.

A      -- amount.

Q      Okay.  And just to clarify, we went through all those

steps.  And if any of those steps are not successful, can't be obtained, then the project is -- remains at a standstill, correct?

A    I -- I have no reason to believe any of those steps won't be successful.  But yeah, if we're not able to lift the stop work order, we're not going to be able to start the redevelopment project.

Q    Okay.  And if you're not able to raise the financing, you also won't be able to complete the project, correct?

A    I don't know that.  I'm not on the finance side of the project, I'm strictly on the --

Q    Right.

A    -- construction side.

Q    And because you're not on the finance side, you don't have an understanding of whether Parkview, for example, has the wherewithal to just pay the entire amount and pay the whole thing and fund the entire thing all on its own, without any financial partner.

A    It -- it's very rare to go through a development of this size without some sort of financial assistance from an outside party.  I mean, no developer in New York does that. That's not how things are done.

Q    Okay.  And in fact, Parkview is looking now for a financial partner, as I think we mentioned, right?

A    Yep.  Financial and development partners, yeah.

Q    Okay.  And Parkview has engaged another firm to help it find a financing partner, correct?

A    I believe the Hogan Lovells team hired JLL to help us find both a capital partner and a development partner, yeah.

Q    Okay.  But nothing is signed up yet, correct?

A    No.

Q    You gave tours, though, to potential partners, right?

A    I did.

Q    Okay.

A    I was involved in some of those.  The JLL team, who is the broker we've hired to help us find a partner, they really take the lead on that.  But yeah, I was involved in a couple of them.

Q    And to your knowledge, only one entity has submitted something in writing that expresses some interest in partnering, correct?

A    Yeah.  One group expressed very, very serious interest in getting involved immediately.

Q    Okay.

A    We don't have any written proposals from other groups that have shown interest yet.

Q    Okay.  And the very serious interest that you mentioned, that's not a letter of intent, correct?

A    No.  It's a --

Q    Okay.

A       -- proposal outlining their business plan.

Q       Okay.  Does it indicate how many dollars that potential partner is going to commit?

THE COURT:  I am struggling to understand the relevancy of these detailed questions.

MR. BRETT:  Very well, Your Honor.

THE COURT:  I understand that you're challenging, maybe, the feasibility of the development of the plan.  But we're starting to get into territory that I don't feel comfortable, given we're revealing potential things that could be harmful to the development of an actual plan.

MR. BRETT:  I assure you I am not trying to do anything to harm.  And I've been very careful not to call for the name of anyone.

THE COURT:  Okay.  But --

MR. BRETT:  But I am absolutely going to the feasibility of this plan and how speculative it is, and actually that was my last question on that line.

THE COURT:  Okay.

MR. BRETT:  Okay.

THE COURT:  So you're asking for the numbers?

MR. BRETT:  I was asking him to confirm there were no numbers --

THE COURT:  Oh --

MR. BRETT:  -- because my understanding is there

were no numbers, based upon the deposition testimony.

THE COURT:  Okay.  You may answer whether there are numbers.

THE WITNESS:  I'm sorry.  "Numbers" as in what are they going to commit, in terms of capital for the redevelopment?

MR. BRETT:  Correct.  I -- and please, if there were numbers disclosed in that --

THE WITNESS:  There were numbers disclosed in the proposal.

MR. BRETT:  There were?

THE WITNESS:  Yes.

MR. BRETT:  Okay.

THE WITNESS:  Not numbers necessarily specific to how much capital the redevelopment project would cost, but there are developer fees that were outlined in the proposal.

MR. BRETT:  Oh, okay.  Okay.  That -- I'll move on. I'm not trying to get too deep into that.

BY MR. BRETT:

Q    Just back to the DeSimone report.  There were drafts of that DeSimone report submitted, correct?

A    There was an initial inventory audit of what work was completed by the prior borrower.

There was then a second report issued as a high-level, rough order of magnitude pricing for the completion, which is

a document that myself, consultants, Mr. Brill, our design team studied very carefully.  And we were able to find items within that initial budget that were not necessary or could be scoped down.

And we were able to -- as the final deliverable from DeSimone, as part of their pre-construction contract, we landed on the sixty-eight-million-dollar number.

Q    Okay.  And the initial number was, I think, eighty -- was it $82 million?

A    Roughly 82 million.

Q    Right. And the -- and they also had a longer time frame initially too, right?

A    I don't recall that.  I haven't looked at it in a little while to be totally honest.

Q    Okay.

A    I focused on the third one, but I -- I don't --

Q    Fair enough.

A    -- think so, but I -- I can't be sure.

Q    Fair enough.

MR. BRETT:  I have no nothing further at this time.  Thank you.

THE WITNESS:  Thank you.

THE COURT:  Redirect?

MR. FAY:  Do you have any question, Your Honor?

THE COURT:  I do not.  Thank you.

MR. FAY:  Okay.

THE COURT:  Can you get it closer to the mic again?

THE WITNESS:  Sure.  I'm sorry --

THE COURT:  -- I know our --

THE WITNESS:  -- about that.

THE WITNESS:  -- chair is absolutely terrible.  It was supposed to be replaced, so I'm going to follow up on that after today's hearing.

REDIRECT EXAMINATION

MR. FAY:

Q    Mr. Kohn, just a few follow-up questions.

On the cure agreement, counsel for the ground lessor raised the fact that the ground lessor needs to agree to that.  Have they ever indicated to you, anyone representing the ground lessor, that they won't?

A    Not to my knowledge.

Q    Okay.  Can you think of any reason why they wouldn't?

A    No, I don't see any reason this -- I don't see any way this project could continue without the cure.

Q    Okay.  Then counsel talked about the various steps, lifting the stop work order, filing the post-approval amendment to the plans, beginning construction, finding a contractor, finding subcontractors.  Is any of that unusual?

A    No, that's all very, very standard construction

process.

Q      Okay.  Would it be the case that there's a stop work order here, and that's a little unusual?  Is that unusual?

A      The stop work order was something that we inherited. It happened prior to my joining Parkview.  I have heard details about what led to the stop work order, but I don't know any of it firsthand.  But stop work orders are not unusual --

Q      Okay.

A      -- in the city.

Q      And the steps that you've been taking with Mr. Brill to get on the other side of that and start construction, is there anything unusual about any of that?

A      I'd say we've been going above and beyond what is typical.

Q      Okay.  Counsel suggested that, if one of these steps couldn't be done, the project wouldn't get done.

Are any of these steps, in your opinion, things that can't get done?

A      Not at all.  We're working very hard to make sure all of them get done.

Q      Okay.  Is this a feasible project?

A      Absolutely.

          MR. FAY:  That's all I have, Your Honor.

          THE COURT:  Okay.  Thank you.

Mr. Kohn, you're released from the witness box.

THE WITNESS:  Thank you very much.

THE COURT:  Thank you so much for your efforts to attend today.  I appreciate it.

THE WITNESS:  Thank you.

(Witness excused)

THE COURT:  Let me ask if is there any other evidence that I will be taking in today from either side?

MR. GORDON:  Not that I know of, Your Honor.

MR. FAY:  Not from the debtors, Your Honor.

THE COURT:  Okay. Any documentary evidence?  I have all -- I have quite a few binders to the left of me.

MR. FAY:  There are exhibits.  I guess we should move in our exhibits.  So we will formally move for entry of exhibits.  Do you want to --

UNIDENTIFIED SPEAKER:  Mr. Kohn and Mr. Brill's declarations have exhibits.  We would move those exhibits into evidence, Your Honor.

THE COURT:  Okay.  Any objection to the admission of the exhibits attached to the two declarations?

MR. BRETT:  No objection, Your Honor.

THE COURT:  Okay.  They're admitted.

(Declaration exhibits of Abraham Kohn and Glenn Brill, received in evidence)

THE COURT:  Okay.  They're admitted.

All right.  So does that close the evidentiary portion of the debtors?

MR. FAY:  Yes, it does, Your Honor.

THE COURT:  Okay.  Let me ask the ground lessor. Is there anything further that you will be admitting in evidence, documents or testimony today?

MR. BRETT:  If I --

THE COURT:  And if you'd like to take a break, I'm happy to do it.

MR. BRETT:  No.  I just -- maybe 20 seconds --

THE COURT:  No, that's fine.

MR. BRETT:  -- as I just consult, Your Honor.

THE COURT:  That's fine.

(Pause)

MR. BRETT:  Your Honor, I just wanted to make sure that the ground lease itself is admitted, and I'm looking for where that was attached to make sure that you have that. It's rather significant.

THE COURT:  I mean I have it.

MR. BRETT:  Right.

MR. GORDON:  It was certainly attached to the original motion as an exhibit.

THE COURT:  Okay.  So --

MR. GORDON:  So it's there.  It's in the record.

THE COURT:  -- do we agree we'll move --

UNIDENTIFIED SPEAKER:  It's one of the exhibits.

THE COURT:  We'll move the ground lease into evidence?

MR. GORDON:  Yes, please.

THE COURT:  Okay.  Any objection to the moving of the ground lease into evidence?

MR. FAY:  No, Your Honor.  It's actually an exhibit to Mr. Brill's declaration.

THE COURT:  Oh, okay.

MR. GORDON:  Okay.

THE COURT:  Okay.  So --

MR. BRETT:  I'm making sure.  Thank you, Your Honor.

THE COURT:  Thank you.

MR. BRETT:  Yeah, that's it.

THE COURT:  So to the extent that it is not an exhibit, it will be admitted and I have a copy of it so --

MR. BRETT:  Okay.  Thank you.

THE COURT:  -- I'm familiar with some of the ground lease.  It's quite large.  Okay.

MR. FAY:  Okay.

THE COURT:  So we'll move into argument then. We'll close the evidentiary portion of today's hearing and move into  argument.

MR. GORDON:  Yes, Your Honor, and I'll be brief.

THE COURT:  Okay.  Can we take a five-minute break?

MR. GORDON:  Absolutely.

THE COURT:  Great.  I'll be back at quarter of. Thank you.

COUNSEL:  Thank you, Your Honor.

(Recess taken at 10:36 a.m.)

(Proceedings resumed at 10:50 a.m.)

THE CLERK:  All rise.

THE COURT:  Thank you very much for the break. You may be seated.

Okay.  Happy to entertain argument when you all are ready.

MR. GORDON:  Your Honor, I'll be brief.

The debtors would submit that the evidence presented by the debtors unequivocally demonstrates that the Plan and the only Plan of the debtors for development of the property is a residential complex.

As set forth in the declarations of Mr. Brill and Mr. Kohn, that is based on the sub costs and current buildout, making a pivot simply not feasible, from the debtors' perspective, and it's based on the fact that the only viable use from a market standpoint is a residential complex, from the debtors' perspective.

The cross examination appears to focus solely on

the status of the project.  There was no questioning directed to or eliciting testimony of an intention to develop the property for any other purpose other than a residential complex.

Accordingly, based on the evidence presented, we submit that the purported ground lease, if a lease at all, is a lease of residential real property for purposes of Section 365 of the Bankruptcy Code and, therefore, the assumption or rejection is governed by Section 365(d)(2) of the Bankruptcy Code and not Section 365(d)(4).

We therefore respectfully as the Court to grant the debtors' motion seeking that determination.

Thank you, Your Honor.

THE COURT:  Thank you.

MR. BRETT:  Okay.  Your Honor, I think it's important to just back up just a moment and remember that when the lease was signed, the only approved use was as a hotel.  The hotel was closed.  The lease contemplated that the -- there might be a conversion to a multi-family property.

The lease also contemplated that that conversion might not occur.  The lease provides for something called a fallback project and a fallback business plan that would relate to a fallback project and the fallback project could be, for example, a hotel.

So the lease, although it does say in the beginning that the intention is to convert, it was not then a multi-family property.  Okay?

Today, it is not a multi-family property.  It is a stalled construction site.  The -- during our last hearing, we talked a bit about the SRO units and Your Honor I think correctly pointed out that those units are a very small piece of the property.  I know today we heard 7,400 square feet out of some 400 some odd thousand square feet.

But -- and I think Your Honor got it right there in terms of that's not dispositive.  Of course, our papers outlined why SRO tenants had different considerations and shouldn't be considered here.

And Your Honor, in your preliminary ruling, made it clear that we should look at other things besides the SRO units and so that was the focus of today and what we heard today was that this is a well-intentioned, they're trying project.  They would like it to be a multi-family property. They are trying to do step one, which is the HPD cure and lifting the stop work order as a result, but that's not where they are right now.

It's a speculative project at best.  There are -- what we heard is it will take years to get this project done, something like $120 million, and there is no evidence that they have the ability to pull that off.  They may really want

to.  We can applaud that but that's not where they are right now.  That's not where the property is.  The property is not a multi-family property today.  It is a stalled construction project.

The project to be completed needs third-party help, needs the financer -- the financing source.  It needs the developer source.  This is totally different than the cases that we've been looking at and briefing.

The Guardian Elder case, which I appreciate and I agreed with Your Honor's sentiments in the last hearing that it was a well-written decision.  And I think we can go through what that decision -- with the guidance that decision provided and apply it here and when you do that, I think you have to conclude that this is not residential real property.

The Guardian case has factors that they -- he -- the judge there made it clear that you have to look at the specific facts and the practical realities of the case at hand.  Okay?

Factor one was the primary use of the property.  Well, when the lease was signed, it was a hotel that was closed and right now it's a stalled construction site.

That's where we are right now.  In ten years maybe we'll have a different set of facts but that's not what the facts are today.

The -- that's so different than Guardian Elder, a

skilled nursing facility with residents in the -- you know, in their respective residences with an up and running business.  That's not what we have.

THE COURT:  Yeah, I don't think anybody would suggest that this case is on fours with Guardian Elder or --

MR. BRETT:  Right.

THE COURT:  -- quite frankly --

MR. BRETT:  Anything, yeah.

THE COURT:  -- any of the cases that are in written form.  So --

MR. BRETT:  Agreed.  Agreed.

THE COURT:  -- you don't need to do much to convince me on that.

MR. BRETT:  Okay.

THE COURT:  But I agree with you that the discussion of Judge Deller on this issue, in reaching his conclusion, is what the focal point for me was in saying I was swayed by that case; in other words, that it's a totality of the circumstances test.

MR. BRETT:  Right.

THE COURT:  And I think he explains the struggle he has with a adoption of a stringent --

MR. BRETT:  Okay.

THE COURT:  -- test because there's -- and he cited the examples where maybe a stringent test would apply.

MR. BRETT:  Right.

THE COURT:  So I think we're on agreement on that.

MR. BRETT:  Right.

THE COURT:  Um-hum.

MR. BRETT:  Right.  Well, thank you, Your Honor. And factor two is the intended purpose of the lease and, look, it says the intended purpose was to convert to a multi-family.  But is it enough to have the intention?  Is it enough to say we want to do this or do you have to make some assessment that really this intention is at hand.  It's realistic.  It's right there.

You know, I don't mean to be flippant but it's kind of coming up on graduation season and if you take the valedictorian of your local high school and you say what do you want to be when you grow up, and she says, well, look, I'm number one in my class; I got into every Ivy League school I applied to; I want to be a doctor.  Okay?  When you do call that person doctor?  Okay?  Best of intentions, all the right, you know, characteristics of someone who will be successful.

That's what we have here.  We have the best of intentions.  We have some promising communications with a community board member.  I get it.  Maybe the HPD cure agreement gets signed up.  But the money is not there.  It's a construction site today and that's where we are.  We don't

have residences in -- residents in there now.

His next factor from the Guardian Elder case was the nature of the occupancy by the residents.  Of course, I'll say it again, there are no residents there now.  I'm putting aside the SRO units because that's -- I think we thought that was appropriate.  It's just a construction site.

Then we have regulatory requirements.  Your Honor focused in on the fact that there's nothing else here at play and it's really about the SRO tenants and if they're going to build and complete a multi-family, then we have some regulations there but, otherwise, we don't know if that's happening.

The economic and commercial aspects of the lease, that was the next factor.  This is clearly a commercial purpose, clearly a profit motive here.

The next factor was the relationship between the residents and the property.  Again, we have no residents.  So they're all lining up for us.

And then the last one was the legislative history and this one was interesting because I'll give some thought as to how to apply this and how Guardian Elder applied it.  In Guardian Elder, the judge was concerned with 365(d)(3)'s requirement that rent get paid currently and the concern from the judge there was that the diversion of resources would make it so that the skilled nursing facility wouldn't be able

to carry out its mission of providing skilled nursing services.

We know that the case is very distinguishable but that's not what's happening here.  Okay?  There is no revenue coming out of the property in any meaningful sense.  This is all completely being funded by Parkview.  We don't have a set of considerations relating to skilled nursing or an ongoing business at all.

So all these factors, Your Honor, would suggest, I submit, that this is not the case to conclude that a construction site is a multi-family non-residential real estate.

If you have any questions, Your Honor, please, I'm here.

THE COURT:  I don't.  Thank you very much.

MR. BRETT:  Okay.  Thank you.

THE COURT:  Thank you.

MR. FRY:  May I briefly?

THE COURT:  Sure.

MR. FRY:  Thank you, Your Honor.

Your Honor, we recognize that this is a different situation than a completed skilled nursing home but I think actually the example that opposing counsel provided about a valedictorian is perfect for highlighting what is different about this.

This is not about just aspirations and what we want to do.  The testimony has been that tens of millions, if not hundreds of millions of dollars have been invested in this property and demolition has been completed on 90 percent of the property and buildout has been done specifically with a view to making this property a residential property.  There has been activity.  To just call it a stalled project is really over-simplifying the matter.

There has been testimony about the efforts to work with the regulatory authorities to effectuate a residential use of this property.

I would submit that, you know, all of that supports in this case, finding that the lease is a lease of residential real property.  The attempt to do otherwise essentially, really, I would argue, Your Honor, would force the debtors into a situation where they have to assume this lease by May 20th.  Very difficult.  And the idea of course is -- by MSP is that if we can't, then they get to take the property and the hundreds of millions of dollars that Parkview has invested in that property and in three years' time have -- under a 99-year lease, in three years' time, they get to take the property.  Okay?  That's a windfall.  That's not equitable.

And so if it's even a close call, I would submit that the debtors should -- the property should be viewed as a

residential real property.  All that does is extend the time for assuming or rejecting so that we can have our day in court on recharacterization, so that we can have our mediation session on May 1.

MSP wants to cut off that process and we submit they should not be allowed to do that.

THE COURT:  Okay.  Thank you.

Well, thank you very much for all the presentation of the evidence today for the -- for me at my request.

I understand it's costly to bring witnesses and prepare for an evidentiary hearing but I still believe, and this hearing today confirmed, that I made the right decision because this decision is an unusual one for cases of this nature, of cases that are before me.

It -- things arise in Chapter 13 cases with individuals that is somewhat relevant.  And as you noted in the case law, it pops up in nursing home cases and other unique areas, but not necessarily in what I have before me, so I think it was worthwhile to have the declarations today and, of course, I need to make my decisions based on evidence and not testimony of counsel at podiums.

But based on the evidence that has been presented, I am prepared and will hold that the real property, which is the subject of the lease, is residential in nature and, therefore, Section 365(d)(2) applies.

I admit that the facts and circumstances presented are somewhat unique, as we discussed, from the existing case law because the building -- the property that is relevant is in its nascent stages of construction and because of the stop work orders, actual construction on the project is stalled, per Mr. Kohn's testimony, and that makes it unique, I think, from what has been reported in bankruptcy cases that are published.

But the reality is I have to make the decision as to the nature of the property today and I must do so based on the evidence that is in existence and that has been presented to me and, based on that evidence, you know, I come to the conclusion that it's residential.

The lease was for the purpose to convert the property to residential units with only a small fraction of space devoted to commercial property.  Couple that with the unrebutted and persuasive testimony of Mr. Kohn and Mr. Brill that the parties' intention is to pursue this purpose and that they are, in fact, pursuing it with the fact also that the City, through HPD and DOB, is viewing this building as a current residential building for the SOR tenants and residential for future tenants of the project that is being pursued is really the important factors for me in making this decision.

I acknowledge that other cases have set forth many

factors for the Court to review.  Some are not pertinent to my decision today and some are.  But these are the major factors.  These are the factors that go into making my conclusion in this particular case and so I will enter the order that is attached to the motion, unless there are changes that need to be made to it.

I thought it was a very straight -- if memory serves, it was a very straightforward motion that simply said that the lease was subject to 365(d)(2).  If there's any other -- I'll take a look at the order and make sure I'm comfortable with it, that there's nothing too broad of scope in that order and if it's acceptable, I will go ahead and enter it, subject to it being uploaded, Mr. Chipman.  You can perhaps do that.

MR. CHIPMAN:  We'll do that, Your Honor.

THE COURT:  Okay.

MR. CHIPMAN:  Thank you.

THE COURT:  All right.  So that takes care of one of the four things on the agenda today.  How do you -- how would you like to proceed?  You're going in order on the agenda, correct?

MR. CHIPMAN:  Your Honor, for the record, William Chipman, on behalf of the debtors.

Yes, I believe it makes sense to just keep going down the agenda.

THE COURT:  Okay.

MR. CHIPMAN:  I think the next item is the letter from the Committee.

THE COURT:  Okay.

MR. CHIPMAN:  Item number three on the agenda.

THE COURT:  Okay.  Good morning.

MR. HOOPER:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. HOOPER:  Ross Hooper, from Seward & Kissel, for the Official Committee of Unsecured Creditors.

With respect to the letter submitted by the Committee at Docket Number 391, this is framed almost as a discovery dispute.

I think the reason why we are here, we haven't been able to get things resolved with debtors.  In part, is we -- the Committee is concerned that the debtors are using an assertion of work product protection to interfere with the functioning and administration of the Committee here.  So it's not just about this report, which we heard testimony previously about.

But just to take a step back, back in the DIP Order that waws entered by this Court -- that was 255, one of those exhibits, Exhibit 3, listed the milestones and, you know, from the very beginning, you know, the parties agreed and the debtors then agreed to provide to the Committee an

update on the status of progress towards finalizing what they described as the rough order of magnitude budget and the draft construction schedule by January 31st of this year.

January 30th, that's when the debtors provided the Committee's professionals with what's been referred to as the second Desimone report.  That's a preconstruction survey prepared by Desimone Builders for Taconic Partners, which is the debtors' construction consultant.

THE COURT:  Is it the report that I heard MSP use for their purposes to dispute the last matter for their cross examination?

MR. HOOPER:  So this is the same report.

THE COURT:  Okay.

MR. HOOPER:  And --

THE COURT:  So --

MR. HOOPER:  And to be clear, the debtors provided the report to the Committee professionals.  At that time, we then requested authorization under our confidentiality agreement to provide it to the members of the Committee so that the members could make informed decisions about construction costs, construction timelines, key issues we think in this case going forward.

At that time, the debtors agreed to provide the report to two of -- or to allow us to provide the report to two of the three Committee members and raised two objections,

in sum, to providing it to MSP.

So the first is that the debtors view this report as attorney work product prepared in connection with these bankruptcy cases on a wide view.  The second issue that the debtors raised is that they believe that MSP is conflicted, okay, with respect to this report.

Now, I think --

THE COURT:  Can we start with the second one?

MR. HOOPER:  Well, and I think to be clear --

THE COURT:  I think that there might be a conflict.

MR. HOOPER:  Well, I think there's two issues.

THE COURT:  Okay.

MR. HOOPER:  One is they are clearly adversarial.

THE COURT:  Yeah.

MR. HOOPER:  To the extent this material is work product, then disclosure to an adversary would result in waiver of the work product protection.  I -- we are not taking the position that they are not adversaries.

The question I believe would be, with respect to this particular information, right, if it is not work product, and we don't believe it is because this is -- as Mr. Kohn described it, this is a construction budgeting timeline.  This is something that -- as even the debtors called it a detailed roadmap for the completion of

construction at the hotel.  This is something that would've been created in essentially the same form even absent the bankruptcy cases.

With respect to the question of a conflict, in the role as a member of the Committee, it's our view that this information and each Committee members' -- as part of their work on the Committee that -- that that does not have a conflict, to the extent they're using it in that capacity, not in their litigation.  We're not taking a position on the pending -- there's a pending motion, I believe, Your Honor, that -- in the adversary proceeding with respect to use in that proceeding.  We haven't taken a view on that.

Here, each of the creditors who are on the Committee have an interest in being able to evaluate and assess the debtors' proposals for a Plan, or lack thereof, going forward in these bankruptcy cases.

To the extent that a potential Plan objection is sufficient to raise a conflict that would prevent us from disclosing information to a member, each member of the Committee, potentially, could raise an objection to Plan confirmation.

It is taking a view from the hypothetical Plan objections we don't think has any support as a basis for preventing members of the Committee from getting information in their capacity as members of the Committee.

And, just generally, it's a three-member Committee and if we're denying information to one of those three members, we do think that will have a negative effect on the administration of the Committee going forward.

To the extent Your Honor wants to deal with the work product issue more, happy to talk about that. You know, just to be clear, this report, which Your Honor does not have, has not been submitted under seal here. But I believe the debtors would agree this doesn't have an analysis of litigation risk. There's no assessment of regulatory compliance going forward, nor is there even an analysis of whether the project can be completed.

This is really a timeline and a budget and we think that is all relevant for all lender -- for all creditors going forward in this case.

THE COURT: Okay. Thank you.

MR. FAY: Thank you, Your Honor. Just a couple things.

As counsel says, the Committee has -- the have the report and their professionals have the report. The only thing we've requested is that MSP, who is our adversary in just about everything in this bankruptcy proceeding, not get it. And why? For what counsel said. It's a roadmap. It's a roadmap for completing this project and MSP has -- MSP's behavior suggests that they want to complete the project or

they want to take it.  They certainly want it.

So why would we give them, for free, a detailed roadmap that we prepared for our ultimate confirmation Plan where we expect MSP to yet again be an adversary.

THE COURT:  Where is the evidence that this was prepared in anticipation of litigation, because the testimony suggests the opposite, and I have nothing else?

MR. FAY:  Because this is the debtors' work product, right?  This is the debtors' --

THE COURT:  Well, it's the debtors' document.

MR. FAY:  It's the debtors' document --

THE COURT:  Okay.

MR. FAY:  -- preparing for an ultimate Plan of confirmation, which we anticipate -- and, again, anticipate will be adversarial.  And it doesn't have to have legal analysis in it.  It just needs to go to the core of that litigation effort.

THE COURT:  Was it the primary purpose in creating the document?

MR. FAY:  Absolutely at this point because we're in bankruptcy, right?  Also --

THE COURT:  So I'm -- I am so sorry.  Back up.  So your assertion is that if you're in bankruptcy and you prepare a document in bankruptcy, it's protected by work product?

MR. FAY:  No, no, no, Your Honor.  That's not what I'm saying.

THE COURT:  Okay.  Let's reframe it because it seems very broad.

MR. FAY:  Again, if you prepare a document that is going to be a principal focus of your Plan of confirmation --

THE COURT:  Um-hum.

MR. FAY:  If you're working toward a Plan of confirmation, and this -- you hire someone as a consultant and they come up with a Plan that you're going to incorporate into that plan of confirmation, which you expect to be contested, right --

THE COURT:  Um-hum.

MR. FAY:  Work product applies to anticipated litigation, just like existing litigation.  That makes it work product, right?   Not every document created by the debtors is work product.  I totally agree.  But this is the critical component.

You heard today this enterprise is a project, a project that is very close to being started.  But it -- but that's what it is.  It's an ongoing function.  It's -- to the extent you wanted to call it -- what is its operations?  Its operations is get it going and get it done.  That's the operations here and --

THE COURT:  So let me ask you a question.  If it is fundamental and a critical part of the Plan, then how do you not disclose it if we're headed into an evidentiary fight because you're using it -- you know, you're basically telling me we're going to rely on it but we're not going to let anyone see it or test the testimony of it.

MR. FAY:  That's -- first of all, we've let --

THE COURT:  Or test the substance of the report.

MR. FAY:  We've let the Committee see it --

THE COURT:  Well --

MR. FAY:  -- and their professionals, right?

THE COURT:  But you understand that if MSP, in its individual capacity, objects to feasibility and you're relying on this report, you will have to disclose it.

MR. FAY:  At some point.  But just like when you --

THE COURT:  Okay.

MR. FAY:  -- have a consultant that is assisting you in litigation --

THE COURT:  Um-hum.

MR. FAY:  -- none of that consultant's work product is discoverable.  If you designate them as an expert and they show up to expert -- and testify, it's out.

The whole issue here is this is a roadmap.  MSP can create their own roadmap.  They have access to the

building.  They've been there.  They brought a construction crew to the building.  They should not be able -- as one of the cases we said -- they shouldn't be able to freeload off our work product.  That's the only issue.

And the Committee has never explained how just applying this very basic rule of litigation and adversaries impacts their function.  We have said what we don't want MSP having is that roadmap.  But we said tell us what information out of the report would you like and the only information they've ever talked about was length of time.  We gave them that in the depositions on Friday, and budget, the amount.

THE COURT:  Well, they don't know what else is in there.

MR. FAY:  There's a whole roadmap to getting this done.  I mean, as Mr. Brill testified, this is -- I mean this is like a jigsaw puzzle putting this building together.  It is a detailed roadmap.  How do we build this thing?  That's the part of it that we don't want to give to MSP.

Let's assume that there's no work product.  Let's just say there's no work product.  We still wouldn't give it to MSP.  We would produce this -- if MSP and the debtors were in ligation outside of bankruptcy and this report came up, we wouldn't give it to them as a competitor.  We would produce it attorneys' eyes only.  That's what we did.

We produced it effectively professional eyes only.

They have it.  That one person there who's our competitor, who's fighting with us, they shouldn't get it.  That's how -- I mean that's how we do it in litigation.

That's the issue.  The Committee has it.  Their professionals have it.  We created this for the purposes of building out a plan for moving forward.  MSP certainly thinks it's relevant to the adversarial proceeding because they've asked for it in their document request and all we're trying to do is protect that work product at this point in time such that, as the case law we cite in our responsive letter, they shouldn't be able to freeload off it.

THE COURT:  Well --

MR. FAY:  If they want --

THE COURT:  -- I want to -- I'm just going to interrupt you there.  You understand -- and walk me through your understanding of what MSP could do with it if the Committee gives it to them.

MR. FAY:  The could take it out and start looking for people to fund their opposing plan of confirmation.

THE COURT:  Wouldn't they be violating a duty --

MR. FAY:  Well --

THE COURT:  -- that they owe as a member of the Committee?  I know that you -- let's -- I mean we need to be --

MR. FAY:  Yes, they would be.

THE COURT:  You have suspicion.  I'm hearing a suspicion.  I'm hearing that they have a -- you suspect they're building something out.  I don't have evidence.  You're suspecting they're going to take it and they're going to use it for other purposes.  I don't have evidence of that either.

MR. FAY:  But it's anticipated litigation, Your Honor.  We don't have to have litigation.  And, listen, you're right.  If they got it, they shouldn't be able to use it.  But that's not how this stuff works.  That's why, under the bylaws of the Committee, when there's a conflict, there's a recusal, right?

THE COURT:  Okay.

MR. FAY:  When there's a conflict on a board of directors, we don't say well, you might not use this or you might -- we just make that person recuse themselves.

THE COURT:  Right.  And isn't that a matter for the internal operations of the Committee and Committee's counsel's judgment?  Why are you stating today that you believe that the Committee bylaws and fiduciary duties will be breached?  You don't know that.

What -- couldn't -- shouldn't Committee counsel be entitled to run the Committee per their bylaws in accordance to the fiduciary duties?  There are ramifications that I have is someone violates those.

MR. FAY:  Listen --

THE COURT:  But are we policing the fear?

MR. FAY:  No.

THE COURT:  Or should we police it more appropriately after it's violated?

MR. FAY:  We are not trying to run the Committee. The purpose of pointing to those bylaws is merely to say the Committee has ways of dealing with this, right?  We're not trying to run the Committee.  We're not saying that the Committee is violating its bylaws.  We're just saying there is a provision -- there is a mechanism that exists for dealing with this, short of just providing to our adversary what we believe is both work product and very confidential information.

THE COURT:  Right.

MR. FAY:  So I wouldn't even dare to say that this Committee is not running properly, they're not doing what they're supposed to do, because I don't know.  I have no idea.  But there is a mechanism for proceeding here in their own bylaws that would address this problem and that's the only reason we raise it, Your Honor.

THE COURT:  Is this a creature of timing?  It seems like it may be creature of timing.

MR. FAY:  I think it's a creature --

THE COURT:  Because if we were more advanced, this

may be a simpler question.

MR. FAY:  Yes, I think you're right, Your Honor.

THE COURT:  But we're in a -- I don't want to say doldrums because that creates a negative implication.  But for  me, it's -- the case is -- not tons happening.  I understand there's -- it's like a duck.  I don't see the legs underneath, okay?  But in terms of what I'm seeing, I don't have a Plan.  I can suspect there's a feasibility issue based on the questioning of witness -- or excuse me, of counsel.  But I don't have an actual Plan.  I don't have an objection.  I don't have an adversarial process before me.

You had to produce this, I assume, under your obligations of the DIP it seems.  Is that why it's going to the Committee at this stage?

MR. FAY:  We did put this to the Committee I think under the milestones and this is the only issue.  The only issue -- the Committee has it.  The professionals have it.  The only issue is can MSP have it.  That's the only issue here.

THE COURT:  Right.

MR. FAY:  So the professionals can go through it.  And, also, we have said tell us what other information in this report you think is critical that MSP needs to know and we'll talk to you about it and some of that information was provided on Friday.

83

We just don't -- you know, we just think it's fundamentally unfair to give our adversary this report.  If they do get it, should they not use it for the purposes we say?  Yes, we agree with that, Your Honor.

THE COURT:  Okay.

MR. FAY:  Right?

THE COURT:  No, that's helpful.

MR. FAY:  Okay?

THE COURT:  Okay.  Thank you.

Mr. Brett, let me ask you a question because you're going to stand up.

You asked the witness questions about that report.  Where did you get that information?

MR. BRETT:  Well, I asked him in deposition --

THE COURT:  Right.

MR. BRETT:  -- all of that.

THE COURT:  Okay.  So that was the first time --

MR. BRETT:  And I called --

THE COURT:  -- you ever heard that information?

MR. BRETT:  Oh, yes, Your Honor.

THE COURT:  Okay.

MR. BRETT:  Yes.  And we knew there was a Desimone report because of this dispute.  But, yeah, in the deposition itself, we -- I asked.  I heard about the Desimone report.  And then I inquired and actually spent a fair amount of time

on it.

And I will tell you my hands were tied in this examination because I still haven't seen it.  I don't know what contingencies there are in that report.  I don't know what -- and I really would've liked to have had that report to demonstrate how speculative this is.  I don't mean to reargue.  But we -- no, we did not have it before.

And I will tell you that I am aware that the Committee has rules and those rules are being observed about the ways in which documents that come through the Committee can be shared with me.  So --

THE COURT:  Okay.

MR. BRETT:  -- I'm well aware of that and so is my client and -- but I -- another reason I rose, Your Honor, is we've had some allegations about my client and my client's motives that are way off base and I really -- it's not appropriate to refer to us as a competitor that wants to do this project ourselves.

THE COURT:  I don't have evidence.  Can I just -- I don't have evidence.

MR. BRETT:  Okay.

THE COURT:  I make decisions based on evidence.  I also make decisions based on observable behavior, and evidence in the record, and legal arguments. I don't have any of that that would support such a contention.  So, rest

assured I haven't made a decision.

MR. BRETT:  Okay.  Thank you, Your Honor, because I was prepared to go through chapter and verse of the prepetition history of how accommodating my client has been.

THE COURT:  Yeah, I don't want that.

MR. BRETT:  I will stop.  Thank you, Your Honor.

THE COURT:  Okay, thank you.  I appreciate you jumping up.

MR. HOOPER:  Your Honor, Ross Hooper from Seward & Kissel.

Just very briefly.  As Your Honor highlighted, there is a lack of evidence here.  There is no evidence that this report was prepared in connection with a plan.  This is a general contractor preparing a construction report.  And I think the Ground Lessor's counsel addressed the other points that I was going to raise here like MSP was vetted as a member by the U.S. Trustee to join the committee.  It is one of the three members.  Debtors counsel keeps saying the committee has the documents.  That is not really right.  Two of the three members and the committee professionals that have the documents.

We believe to maintain an orderly administration going forward, you know, the committee should be able to enforce its own bylaws working with its professionals to deal with any potential conflict issues.

THE COURT:  So, let me just ask you on that point. And I understand maybe you don't feel comfortable answering, but it sounds like you have made the determination, because you sought this relief, that its appropriate for the Ground Lessor to see this report.  And if you have, what is the basis for that?  And I think you explained it to me but just rearticulate it.  It would be for what purposes?

MR. HOOPER:  So, Your Honor, just at a very high level, any determination would be subject to a final confirmation with the professionals and the committee but it is our view that the material here with respect to the timeline and cost of construction for this project is relevant to the ability of the -- of some future plan to be -- will there even be a plan proposed.  That is certainly relevant to the work of the creditors committee in evaluating any plan down the road.

THE COURT:  Okay.  That is helpful.  Thank you.

MR. HOOPER:  Thank you, Your Honor.

THE COURT:  Okay.  Why don't we move onto the next issue and I'm going to think about the answer to this over the lunch break that I will need to take at some point.

Do we want to deal with the DIP and then we will take a lunch break?

MR. CHIPMAN:  I think that works, Your Honor. Thank you.

THE COURT:  Or we could take a break and -- okay.

MR. CHIPMAN:  Mr. Gordon is going to be addressing the DIP as well because they all kind of tie together.

THE COURT:  Sure.

MR. GORDON:  Good morning again, Your Honor.  For the record Robert Gordon of Boies Schiller on behalf of the debtors.

The next item on the agenda for today is the debtors' motion for an order modifying and extending the DIP budget pursuant to the final DIP order.  The relief is necessary to fund the debtors' operations and the case past April 30th when the current DIP budget ends.  And even though the budget is reasonably tailored to fund only necessary and appropriate expenses and merely represents a continuation of the current DIP funding regime, MSP has objected to the motion as it has objected to virtually everything the debtor has done in this case.

We submit that all the objections made by MSP are misplaced based on false factual premises or both and are clearly interposed by MSP to thwart the debtors reorganization efforts and avoid, among other things, mediation on May 1st and the debtors day in court later in May on its adversary proceeding to recharacterize the lease as a financing.

For example, MSP argues that the DIP should not be

approved because the debtors have failed to provide a fallback business plan by March 31st, which is a milestone under the DIP order.  This argument is misplaced because (A) the failure to meet this requirement under the DIP is not a basis for a non-funding party to terminate the DIP, and (B), in any event, the provider of the, Parkview Financial, is entitled to waive that requirement under Paragraph 32 of the final DIP order and has, indeed, waived that requirement as a condition to further financing.

Moreover, the argument by MSP is a transparent attempt, Your Honor, to create a classic catch-22 situation. As we discussed, in connection with the first agenda item today, the Court expressed, on March 12th, its concern about any pivot by the debtor away from the development of the property as a residential complex.  And the fact that it -- and the fact is that the debtors intention has always been and continues to be to develop the property as a residential development.

THE COURT:  Can I just make one point of clarification on this because you can't control in this job how your words are interpreted.  So, I want to be clear, my concern was I was being -- at the last hearing was I was being told that the property would be developed into residential units but I had no evidence of that and, in fact, I had a -- I did not know, given the recharacterization

adversary, if that were to be true.

If the debtor wanted to pivot that is not my business. Okay. I had to determine the truthfulness of the statements that were being made to me and I had no evidence of that. So, I want to be clear, okay, because I'm not here to tell you how to reorganize. That is not my job. So, I apologize if I gave you the wrong impression that I was concerned for some reason that the debtors may want to do something different with the project as a business model. That is not for me to decide, right. That is for the stakeholders of cases to determine how the case will progress and the debtors business judgment on how to make those decisions.

My concern was simply that if you ask me to determine if its residential, I needed to understand what the purpose of the project was and you did give that to me. So, I really hope that my words did not cause the debtors officers and directors to make a decision that would not be in the best interest of stakeholders. That is not my intention.

MR. GORDON: Fair enough.

THE COURT: And I apologize if I did but I want to be clear, that is not what I -- I don't believe that was what I -- at least I didn't attempt to convey that. So, I think the declarations speak for themselves that that is the best

use of the property and that is what is being pursued.

MR. GORDON:  That is correct, Your Honor.

THE COURT:  Okay. If it turned out it wasn't in the best interest of the parties to keep it residential that is not for me.  That is not my role or at least I don't view my role as that in a reorganization case.

MR. GORDON:  Understood.

THE COURT:  Okay.

MR. GORDON:  And because that is the evidence that is before you, again, not only does the -- the debtor believes that this is the highest and best use, so to submit a fallback business plan is requiring the debtor to engage in a fool's errand.  So, we're not going to do it.  We don't want to do it.  We don't want to have any lack of clarity for the Court about what we're trying to do.  We asked Parkview if they would waive that requirement as the funder of the DIP and they agreed to waive that requirement.

Also, just as an aside, Your Honor, I would note that the relevant milestone states only that the debtors shall provide a fallback business plan to the committee, not to MSP.  So, MSP is essentially complaining that the debtors didn't provide a fallback plan to a third party, not MSP.

MSP also argues that the debtors have "refrained" from pursuing construction and asserts insufficient progress in developing the property.  This argument is both specious

and inaccurate. The debtors have indeed made significant progress investing millions of dollars in building out the lease space for LA Fitness and any other construction on the property is, of course, as MSP well knows, subject to the Department of Housing Preservation and Developments stop work order pending approval of a cure program that will lift the order and permit construction to resume.

So, while the debtors have been actively pursuing the lifting of the stop work order, in the meantime the debtors are not refraining from construction, they are prohibited from construction. Again, MSP knows this very well as it disingenuously asserts that the debtors are refraining from construction. MSP also argues that the supplemental DIP financing is primarily intended to fund the recharacterization litigation against MSP and does not benefit the estate.

As we indicate in our reply, filed on April 16th, Docket Number 418, and the accompanying declaration of Alan Tantleff Docket Number 419, this argument by MSP is a gross mischaracterization of the budget. In fact, of the roughly $11 million in a supplemental budget for the months of May through August $3,349,400 is allocated for LA Fitness construction, $3,000,211 -- I'm sorry, $3,211,145 is for property taxes. $2,926,672 is for ground rent being paid to MSP. $870,090 is for insurance. $427,276 is for security

and fire watch.  And $79,000 is for repairs and maintenance. All necessary expenses to maintain and operate the property.

By contrast, the fees budgeted for Boies Schiller for the next 30 days, which would take us past the recharacterization trial, are approximately $400,000.  And there is about a half a million dollars in May budgeted for witness fees.  Thus, the litigation expenses of the recharacterization trial are clearly not a major driving component of this budget and the allegation to the contrary is mere hyperbole.

As an aside, I have never seen an objection to the extension of a DIP budget by a defendant in an adversary proceeding simply because the defendant doesn't like the adversary proceeding.  It's absurd but that is, essentially, what we have here.  MSP is a non-funding -- non-DIP funding party, has no such line item veto over the funding of this case.

To suggest that the final DIP order should not be extended in the middle of these Chapter 11 cases is simply a self-serving attempt by MSP to impede debtors prosecution of the Chapter 11 cases and specifically evade participating mediation on May 1st and deny the debtors their day in court later in May on the recharacterization adversary proceeding.

If MSP believes it has valid grounds to terminate the debtors reorganization efforts then its recourse is to

file a motion to dismiss the Chapter 11 cases which the debtors believe would be completely unjustified under the circumstances but objecting to the DIP motion, which will provide the debtors estates with critically needed funding to maintain operations, preserve the property from waste and ensure the safety of the residents is no the proper vehicle.

So, that addresses the MSP objections, Your Honor; however, I do want to also address the so-called limited objection by the unsecured creditors committee this past Saturday.

By way of background, MSP filed its objection to the DIP motion on April 14th and the debtors filed their reply on April 16th.  The debtors gave the committee an extension of the deadline to respond to the motion until Saturday, April 18th while the parties worked out a budget for the committees professionals.  And, in fact, the parties agreed to a $1 million budget for the committees professionals for the period May through August subject to the allowance of fees under Section 330(a) of course.

The important point here, Your Honor, is that the committee and its counsel were able to see the debtors reply to the misplaced arguments of MSP before it filed its limited objection. They could see that the allegations of refraining from construction were bogus.  They could see that the budget was driven by operational expenses not litigation fees.  Yet,

the committee proceeded, in its limited objection, to mouth the same objections to the DIP motion as MSP.

And it causes me to ask why the committee would take this position.  As it stands currently the general unsecured creditors are entirely out of the money.  In all candor, their only hope of a full recovery is through a successful reorganization.  If there is no reorganization then MSP presumably would be entitled to declare the lease terminated and take back the property in which case there are no assets to satisfy general unsecured claims.

The committee even makes the reckless and ridiculous threat of seeking a Chapter 11 trustee without explaining the legal basis that would exist for such extraordinary relief and how that would create any value in the estate for general unsecured creditors.  So, why would the committee take this position and the question is, admittedly, a bit rhetorical because the answer is obvious.  As the Court now knows from the discussion today there are only three members of the committee and the dominant member is MSP.  MSP whose interests are diametrically opposed to those of the general unsecured creditors is sitting on the committee.  Why?  I have no idea but that is where we are at.

So, by making arguments that support MSP's goals that are antithetical to the interest of the general unsecured creditors we submit that the committee and its

counsel have lost sight of their mandate.  In fact, I've never seen anything like this, a committee arguing for DIP milestones and cessation of DIP financing that is its only path to a recovery.

The committee may have done the Court a proper deed in December and January by pushing for the disqualification of prior debtors counsel but it did not do that necessarily for all truistic reasons and that matter is yesterday's news.  What is happening now is completely improper, Your Honor.

The irony is that the committee and MSP try at every turn to insinuate that there is something untoward and unseemly about the relationship between Parkview and the debtors.  It smacks of unfounded conspiracy theory and childishness.  The fact that Parkview, as a lender, foreclosed on the equity interest and now owns the equity of the debtors is wholly unremarkable in the real estate industry.  And I can report that the professionals for the debtors know where their duties lie and are not beholden to Parkview.

The debtors are pursuing the recharacterization litigation because the debtors believe it is a meritorious cause of action and in the best interest of the estate, not because Parkview may think so.  But if you want to talk about an unholy alliance then the Court should look at the

committee and MSP moving in lockstep when MSP's interests and the interests of the general unsecured creditors are not aligned.  Despite that lack of alignment and the duty to the general unsecured creditors the committee is, essentially, doing the bidding of MSP.

Your Honor, the debtors urge the Court to approve the DIP motion and the extended budget and overrule the baseless and ill-motivated objections of MSP and the committee.  The budget is designed specifically to allow Parkview to fund the operational costs of the property, including paying MSP over $3 million of rent, paying property taxes and insurance.

As such, it is clearly a sound exercise of the debtors business judgment, and MSP and the committee are not entitled to simply substitute their parochial interest in lieu of the debtors business judgment.  Most importantly, the DIP will allow the debtors to engage in mediation, have their day in Court on the recharacterization issue if mediation does not create a settlement among the parties and pursue a plan of reorganization promptly following a determination of the recharacterization issue.  We submit that in the interest of all stakeholders, including the debtors and the general unsecured creditors, that process should be permitted to proceed.

In connection with the first agenda item today,

the Court heard or read the testimony of Mr. Brill and Mr. Kohn about the extensive efforts of the debtors to work with the Manhattan Community Board and the HPD to lift the stop work order and their belief of the lifting of that order is imminent.

The debtors should be permitted to continue that process which benefits all stakeholders including MSP.  And if MSP or the committee thinks the case should not proceed then it is free to file a motion of its own and seek appropriate relief not simply collaterally attack a perfectly legitimate request for additional DIP financing.

Thank you, Your Honor.

THE COURT:  Shall we move the declaration of Mr. Tantleff into evidence?

MR. GORDON:  Oh, yes.  Mr. Chipman, I better just mention that.

THE COURT:  There is always someone that is in charge of the actual evidence.

MR. GORDON:  Thank goodness there is.

THE COURT:  Does anyone object to admission of Mr. Tantleff's declaration into evidence?

MR. BRETT:  No, Your Honor.

THE COURT:  I am hearing no objection.  Its admitted.

(Tantleff declaration received into evidence)

THE COURT:  Does anyone wish to cross-examine Mr. Tantleff on the substance of his testimony today?

(No verbal response)

THE COURT:  Okay.  Thank you very much.

Happy to hear from other parties.

MR. BRETT:  A few points, Your Honor.  And I actually don't intend to belabor this motion very long.

THE COURT:  Okay.  And I read your objection, of course.

MR. BRETT:  Thank you, Your Honor.

My client has been interested from the get go in having a completed project.  Prepetition, if you look at the amendments and the story that has come out, and I know, you know, it's been in different pieces of filings here, the story comes out that this was a project that was supposed to be completed in 2024 or earlier and it hasn't.  And the Ground Lessor has worked first with CSC to try to amend, try to give extra time, and try to get the project completed because the interest here for my client is to have a completed project and just sit back for 99 years and collect rent; that is all.

This is not a profit play for my client to take over the project and compete with the debtors here, which is some of why I was rising in connection with the last matter. When the debtor -- I'm sorry, when Parkview took over the

99

equity in the debtor, Parkview actually didn't comply with the requirements of taking over the debtor.  And we still stood by and tried to work with Parkview and that was unsuccessful which lead to the bankruptcy filing.

Then in the beginning of this bankruptcy, Your Honor, despite the characterization today that we have objected to everything, I don't think you heard very much from us early on at all.  We didn't object to a whole host of things.  We didn't even object to the deadline to assume or reject.  Okay.

When it came time for the DIP, we were concerned about the progress of the project and we wanted some concrete evidence that the project would move forward and we perceived that the Court was concerned by that too. We perceived that the rest of the creditor body was concerned by that too.  And our objection was fairly limited at the time.

Now, one of the things that came from, I guess, a combination of our objection and the committee objection were set in milestones.  And the set of milestones were designed to keep the case on track.  It doesn't seem to be on track. I appreciate there are good efforts going on but one of the things that was supposed to happen was this fallback business plan and it's important to know and remember what that means.

Now, I'd like -- if I can, Your Honor, I'd like to put the definition up on the screen because that is what --

just so we all know what a fallback business plan is.

THE COURT:  I just want to interrupt you because, again, I struggle with the relevancy.  The question is whether I need to extend and increase.  The evidence suggests that the DIP expires at the end of April and so we need to extend.  I don't think anyone is disputing that.

MR. BRETT:  I'm not, Your Honor.

THE COURT:  Okay.  I don't want to be dismissive but this is getting into a therapy session, okay, and I have other things I need to focus on and this is not a productive use of anyone's time.

MR. BRETT:  Okay.  Our --

THE COURT:  All of what I'm hearing, not just you, to be clear.  And so, whether or not the fallback business plan needs to occur, either under the lease or the DIP, doesn't seem relevant to the question that I have before me.

So, let me ask you, if you believe -- how -- explain to me how this is relevant to what I am deciding at this moment?

MR. BRETT:  Because I don't think it was appropriate for Parkview to unilaterally waive requirements that were in the milestones that we all relied upon and its emblematic of Parkview is dominating this case.  So, our point is not that the DIP shouldn't be extended or the budget period but it's that if Parkview wants to invest more money

in here I think it should come in as equity, plain and simple.  It's unusual.

This is an unusual case but I don't think that we need to extend the loans here.  Parkview is absolutely the player here.  Parkview's employee was the 30(b)(6) witness today.  This is Parkview's case and Parkview is investing because Parkview wants to recover on this project.  Parkview should invest equity.

THE COURT:  This is a commercial court.  Why would I require that?  Why is that reasonable?  I understand why you would want it but what is the legal principle for requiring a lender to put in free money?

MR. BRETT:  Because it's also the owner, Your Honor.

THE COURT:  So.

MR. BRETT:  It is also the equity owner and the equity owner should invest.

THE COURT:  Okay.

MR. BRETT:  I won't belabor, Your Honor.

THE COURT:  This is just not how this works.

MR. BRETT:  Well, okay.  I will rest on that, Your Honor. I don't think that the project is -- I think there could be more progress here. I think if the Court is okay with the orders being not complied with, I thought this was something that you should know as well.

THE COURT:  Okay.  Well, isn't the remedy -- this is my point.  There are remedies and methods to enforce contractual or terms of orders.  You are free to seek that but is -- how is it -- it doesn't seem relevant and I don't think you have convinced me its relevant to the need for this extension or increase of the DIP but you would agree there are methods to seek enforcement of orders, correct?

MR. BRETT:  Yes, Your Honor.  And I take your ruling. I won't belabor.

THE COURT:  All right.

MS. LOTEMPIO:  Good afternoon, Your Honor. Catherine LoTempio of Seward & Kissel on behalf of the official committee.

I will keep it brief. I know Your Honor just wants to use the time productively. I just would be remiss to not respond to some of the comments made by the debtors about the committee making objections and losing its mandates.  There is no evidence of that and, Your Honor, I think its false and an unfair suggestion.  I think we made a limited objection to raise some concerns and as we have done in other circumstances in these cases.

THE COURT:  I mean, arguably, you are the recipient of the milestone, correct?  It was to provide the fallback plan to the committee, correct?

MS. LOTEMPIO:  That is correct, Your Honor.  I was

going to address your questions in my short response here.

Again, we did file it and style it as a limited objection kind of just to focus on one overarching issue and that is the committee's concern with the fact that the debtors are seeking additional financing here, that is priming, and they haven't yet articulated a path to reorganization beyond a litigation.

We're six months into the case. We have no proposed plan, no plan framework, no plan sponsorship or exit financing marketing process. And, really, critically here no contingency plan. You know, we believe that the DIP, the original DIP and any continuation of the DIP was approved as a bridge to reorganization. That is, you know, what bankruptcy is for.

The debtors assured the committee and this Court at the original DIP hearing that the focus of these cases would be getting the construction project in check and pursuing exit financing to confirm a plan. And we are concerned that the budget going forward really is entirely focused on litigation spend which results in additional secured claims and superpriority claims that continue to grow.

Now, Your Honor, we are encouraged that the parties with Your Honor's urging, and truthfully with the committee's urging as well, that the parties have agreed to

mediation which may help resolve the litigation and potentially we're hopeful frame a broader path for it in these cases but we still have concerns as we stand here today.  We just don't think these cases can rise and fall on a single adversary proceeding with no alternative strategy.

And to address the milestone, you know, our concerns are highlighted by the fact that the debtors failed to meet the agreed to case milestone.  It's not so much the contents of the fallback business plan but simply that the committee negotiated case milestones to resolve its objection to the DIP which included an objection and concern that there was no case strategy or business plan here.

So, for the debtors to then not provide or live up to those milestones and assert that Parkview had the right to waive it is concerning for the committee.  So, again, our concern, especially given that that milestone was missed, you know, it continues to linger.  Again, we negotiated that milestone at the time of the original DIP.  Never once at that time did the debtors tell us we can't provide that, that is not economical.  We are not going to provide it.  Only now are they saying that, which is concerning.

So, we believe that the debtors business judgment requires just a reasonable showing that they're pursuing a restructuring objective.  We are not asking for a reflective denial in whole here.  We're just looking for some

guardrails.

I just want to note one other point.  The debtors amended budget, which they filed yesterday at Docket 430, includes a footnote that seeks to limit the committee's revised budget to only amounts going forward from May 1st onward and not for amounts incurred through April 30th.  We just think this limitation on the committee professionals is somewhat inappropriate and seeks to kind of punish the committee for, I guess, the positions the committee has taken in this case that the debtors perhaps don't agree with.

The committee agreed to the original budget under the assumption that the committee would not be forced to litigate governance and retention issues with the debtors after agreement on the DIP.  That was not the case.  So, we just don't think that the budget should be used as a sword against the committee.

So, in conclusion, Your Honor, the -- if the Court is inclined to approve the DIP financing we believe it should be conditioned on meaningful protections, concrete milestones unrelated to litigation and a serious evaluation of alternative case paths.  Absent those protections, we are concerned that the DIP risks functioning not as a bridge to reorganization but as a litigation funding that narrows recoveries and forecloses options for the unsecured creditors.

Thank you, Your Honor.

THE COURT:  Thank you.

MR. SIMONDS:  Good lunch time, Your Honor?

THE COURT:  No, let's push through.  I am hungry.

MR. SIMONDS:  David Simonds, Hogan Lovells, for Parkview.

I had planned to give a bit of a narrative about Parkview's involvement in this case but I am reading the room and that is not appropriate under these circumstances.  But I did want to address some comments by Mr. Brett relative to Parkview's control of this case, directing the debtors, refusal to negotiate with MSP.

THE COURT:  No thank you.

MR. SIMONDS:  We view that as untrue and --

THE COURT:  I understand.  I don't want to hear it because for reasons, I'm about to say.  So, let's just go to the actual issues.

MR. SIMONDS:  So, as of the committees budget, Your Honor, committee counsel is incorrect actually. The motion first included the footnote relative to the limitation on the use of funds from the prospective budget to pay the committees past fees and expenses and also limitation insuring that no monies would be spent on the investigation by the committee in excess of the amounts set forth in the DIP order.

THE COURT:  So, in other words, if the amounts incurred by the committee professionals in the months leading up to the expiration at the end of the month exceed what had been budgeted you are saying they can't use the excess fees in the future month to apply?

MR. SIMONDS:  Correct.

THE COURT:  I take no position on that but I understand your position.

MR. SIMONDS:  And that is our view.  And in coming to the new budget, we asked questions of the committee.  How much did you spend in March 2026?  How much have you spent on the investigation?  We asked for, you know, estimates of the future spend on the mediation, the recharacterization litigation and confirmation. We got no answer and we got a refusal to answer.

So, we put in a million dollars to avoid the objection and also we included the specific footnote we talked about.  So, Your Honor, that is something that the DIP lender is insisting on and wants to retain as part of the motion and part of the order.

THE COURT:  Is it in the order?  Is it just the footnote?

MR. SIMONDS:  After we talked to Mr. Chipman about including it as a specific point in the order but it was not included in the order. It was included as a reference in the

motion itself.

THE COURT:  Okay.

MR. SIMONDS:  It's in the budget that was produced after the committees one million dollars was inserted and that footnote is attached to that as well.  Though it is technically part of the budget attached to the order --

THE COURT:  I understand.  Thank you.

MR. SIMONDS:  Thank you, Your Honor.

MR. GORDON:  I will be really brief, Your Honor.

THE COURT:  Okay.

MR. GORDON:  Counsel for the committee just suggested that this cap on the use of future funds against the prior budget is somehow intended to punish the committee. That provision applies to all the professionals, not just the committee.

THE COURT:  So, where would I find that caveat? Is it in the existing order?

MR. GORDON:  I am going to defer to Mr. Chipman.

MR. CHIPMAN:  May I approach, Your Honor?

THE COURT:  I have it.

MR. CHIPMAN:  Can you read that small print?  I have a bigger print.

THE COURT:  I can read it.

MR. GORDON:  Helps to be younger than me.

THE COURT:  It says:

"The amended budget contains an agreed upon amount for the committee professional fee budget.  Additionally, amounts set forth in the proposed amended budget cannot be used to pay for fees and expenses that exceeded the approved budget for the initial budget period through April 30th, 2026 for any professional."

MR. GORDON:  Right.  And let's be clear, budget is a budget.  Caps on the budget are caps on the budget.  It doesn't mean you can't get paid more later under 1129 and as an administrative expense if its allowed and so forth in order to get out of the bankruptcy.  This is about budgeting for the case.  So, I just wanted to clarify that point.

The other point is simply I think I had just gotten through explaining how the budget is mostly about operating expenses and yet you hear again committee counsel say it's for litigation expenses. It is not.  And the lack of independent analysis of that is troubling.

I will stop there.

THE COURT:  Okay. I appreciate that.  Thank you.

I am going to take a short break and I will come back.

(Recess taken at 12:05 p.m.)

(Proceedings resumed at 12:31 p.m.)

THE COURTROOM DEPUTY:  All rise.

THE COURT:  Please be seated.  Thank you very

much.

The motion before me is the debtors' request to increase the DIP commitment and modify the budget. I am prepared to approve that. I believe it is necessary and appropriate as supported by the evidence of Mr. Tantleff.

I am not going to modify the form of order to add anything to the order with respect to the use of the fees that was added in the footnote in the budget. The reason why is it was added, I believe, in the amended budget. There has been no briefing on this issue. All rights are reserved. It's in the budget. I don't think I need to incorporate it into the form of order. If it becomes an issue, we will talk about it. I don't think it will but if it does then I will hear argument on it.

If that is not appropriate for the DIP lender then you may tell me you're not going to agree to extend and amend but I am fine with the amended budget being attached to the form of order with the bolded language at the bottom. I see no need to add it to the form of order.

So, I think you probably, Mr. Chipman, need to upload a form of order with the amended budget attached.

MR. CHIPMAN: Yes. We will make sure that that order is uploaded.

THE COURT: Okay.

MR. CHIPMAN: Thank you, Your Honor.

THE COURT:  Let me say a few things before we adjourn.  I had been debating whether to counsel oral argument on the motion to dismiss based on what I was witnessing in Court today but I don't think that would be efficient use of this estate's money and time and, quite frankly, my time.

I will say this. I make no comment as to anyone's motivations here.  I can tell you this: it's not an efficient use of my time. I joke that I am not a therapist.  I am not a therapist, okay, but more importantly its clear to me that there has been a breakdown of the most basic trust and principles between a debtor and a committee.  I can't speak to why this has occurred and I won't.

The problem is you are about to head into a mediation, a global -- presumably a global case mediation and I would ask you to give serious consideration how to -- how you think that you can employ possible fixes to either your mindset or something else before entering into that mediation on the 1st, I believe it is, so that you can make a good faith effort to try to resolve the complex issues that are before the Court because mediation is costly and litigation is costly.  And it will only be harmful to the very people that are sitting before me.  I don't know who else exists. I'm sure there is others but it's very clear to me that these are the significant stakeholders before me and you are only

112

hurting yourselves, quite frankly.

And Judge -- former Judge Gerber need not spend half the time trying to mend this problem that exists to get you to a point where you could possibly settle.  I know he will.  That is what a good mediator does but you could do some groundwork if you give some serious thought how you are going to change your mindsets when walking into this mediation.  Maybe the answer is you just can't and this is a tough case.

I have tough cases and I deal with them but something is not normal and that creates potentially unreasonable decisions and costly effects for the estate and judicial resources. It is my job and I will devote what I need to, to this case but the collective proceeding of bankruptcy really does rely on basic trust between certain case constituents and its very clear to me that they don't exist.  So, we need to give some thoughts on how to mend that so that the mediation is productive.

With that said, I am going to adjourn and I'm going to take an hour for lunch if that is okay.  If you wanted more time, I can give you more time but I need, at least, an hour.  Then we will come back and we will focus just on the motion to dismiss.

I can tell you now, given the mediation, I am not ruling but I am going to take in the arguments, ask my

questions that I need answered, and then to the extent that I feel after the mediation that I should rule on it I will; otherwise, we already have our expedited trial date and you all are working towards that.  It wouldn't be out of the realm of reasonableness for me to rule if I feel it's appropriate but we will see.

Do you want more than an hour or is an hour sufficient?

(No verbal response)

THE COURT:  Okay, great.  I will give myself a little bit of wiggle room. I will come back on at 1:45.

Thank you all very much.

(Recess taken at 12:36 p.m.)

(Proceedings resumed at 1:50 p.m.)

THE COURTROOM DEPUTY:  All rise.

THE COURT:  Please be seated.

Okay.  So should we move forward with the motion to dismiss?  Happy to hear from the Ground Lessor on it.

MR. BRETT:  Thank you, Your Honor.

I appreciate the opportunity to address this with you.  I know the briefing was extensive but it's nice to be able to talk about it a little bit further and, of course, throughout, Your Honor, I'm happy to answer any questions about this.

THE COURT:  Great.

MR. BRETT:  So, we're here on this motion to dismiss because the claims in the complaint are simply not plausible.  The claims are substantively for claims of recharacterization of the lease.  It's not really clear what would be recharacterized to.  They its financing, presumably debt financing.  And then the other fundamental claim is a fraudulent conveyance claim dealing with an amendment to the lease, the last amendment that was done, the fourth amendment in 2024.

So, I think it's important to, again, maybe walk through the story just a little bit.  There was a totally unaffiliated third party that owned the Hudson Hotel. Referred to generally as the Cain Group.  They marketed the property for sale.  We're the broker.  And CSC, the former sponsor, was interested in the property and they pitched it to my client and eventually, after some discussion, my client purchased the property.  There is a deed from the unaffiliated seller to the Ground Lessor.  The deed is, of course, recorded and a transfer tax was paid.

At the same time, the CSC entity, controlled at that time by the Smeke brothers, wanted to -- their business plan was to, as we all know, convert the property into a multi-family residence.  They approached others about financing the work that would be done to effectuate the conversion.  Ultimately, it was Parkview who stepped up to

provide the construction financing.  It's not an unsecured loan.  It's a secured loan and the security is the leasehold interest.  So, they filed -- Parkview filed a leasehold mortgage.

The lease itself -- we can talk about a few of the aspects but actually don't think you need to know many, many of the aspects.  You don't need to know too many details but a few to bear in mind are that it has rent.  That it has a 99-year term and critically, and this is huge, there is no purchase option for the tenant.  There is no ability to repay the Ground Lessor here.  There is no ability for the Ground Lessor to put the property back in demand repayment.  So, it's just a straight term and at the end of 99 years my client gets the property back.  Clear as a bell in the documents.

The Parkview lender signed at the same time a leasehold financing agreement which is rather typical for leasehold financing.  And the document itself, the lease itself provides leasehold mortgagee protections.

In sum and substance, there is a few fundamental protections that a leasehold mortgagee gets.  One of them is an entitlement to receive notices of default, another is the opportunity to cure monetary default so that the lease stays in place and the leasehold lender doesn't lose its collateral because that is tough when the leasehold mortgagee would lose

its collateral.  Then one other aspect is if the lease is terminated the leasehold mortgagee has the right to step in and actually get a new lease.  It has to cure the defaults but it can effectively allow the ouster of the ground tenant and assume the position itself, okay.

Again, the leasehold financing documents were recorded with a leasehold mortgage -- actually two leasehold mortgage documents because there were two different loan agreements under the (indiscernible) construction law in New York.  So, the project begins.  There was one amendment soon after because there was an option to purchase a particular floor.

In 2023, it's kind of a critical time, Parkview had liquidity problems and stopped funding the project.  That caused a great deal of disruption in the project and Parkview brought in another lender to take over the lending position and be able to fund the project so it would keep going.  We refer to that entity as Northwind who is an SPE owned by Northwind.  Northwind did a new leasehold financing agreement.

The loan documents were amended, the lease documents were amended.  And then later in the year, that was I think in May and in December, Parkview's liquidity had been, I guess corrected and they stepped back in and retook over the spot as construction lender.

It was around this time when the tenant had some additional issues with not being able to get the certificate of no harassment, that is the CONH that we've heard about in other contexts.  There were some other issues that came up.  Some of their inability to access financing caused things like mechanics liens to be filed.  Those were defaults under our ground lease.  And the project was clearly in trouble sort of from the beginning of 2024 and in a three-way discussion between the debtors and Parkview, the debtor tenant at the time, CSC controlled, and us eventually a fourth amendment was executed.

The fourth amendment did several things.  I will tell you that most of them were for the benefit of the tenant.  The tenant needed time to complete its construction project.  The tenant needed some relief on what is called a right size payment. I will deal with that in just a moment.  And some time to address the cure issues and they were also, at the time, contemplating a hotel use and wanted us to consider both a hotel and multi-family use, and allow for time for that because it was quite clear that the construction deadline was not going to be met.  So, that is the fourth amendment.

The right size payment, I should add, in the original lease was triggered if the original business plan of the tenant could not be achieved.  And as soon as the CONH

requirement was, sort of, rejected by HPD or they gave the signal that it would be rejected, they knew they wouldn't be able to comply with that.  So, anything else is what is called a fallback business plan or fallback project because it's not the full all units being market units.  And if there was a fallback business plan the idea was, well, then that means the property itself is not going to generate the cash flow that it should, that would support the rents under the lease and, therefore, our property, which we owned in fee, would be worthless. So, the right size payment was intended to reduce the rent by having the tenant effectively buy down rent.  It's the best way to think about it.

I don't love the term "right size payment" but I do like the concept of buying down rent.  And the idea of buying down rent is then the anticipated income of the property would be consistent with the healthy property and if it's a healthy property then the tenant can do things like finance its position or sell its position.  If there is not enough income coming in to support rent then that is a problem.

So, that was the original theory of the right size payment in the lease, which I think is a topic of some discussion in the responses here and the complaint.  But because they also did fail to achieve the CONH requirement, the property is worth less and the prospective was the tenant

should pay for the property being worth less that we now own and we have to deal with.  And that is why rent went up a little bit.  So, rent went up a little bit but the right size payment calculation went drastically down and was drastically deferred to accommodate the construction schedule.

So that is the fourth amendment, all the subject of negation that went on for months. The debtor ultimately signed off on this, of course, and Parkview signed off on it and expressly signed the fourth amendment and at the same time amended its own loan documents.

So, then the matter proceeded, the development continued to experience difficulties, unfortunately. Defaults under our lease continued.  There were additional problems that were mechanic's liens that kept popping up and Parkview was approaching its maturity date.  The original maturity date of the Parkview loan was in late 2024, which, of course, couldn't happen because of the failure to complete the project on time.

So, it's late 2024.  Defaults have been in the Parkview loan because of the maturity date and because of, you know, a bunch of other things.  Parkview and the debtors tried to settle their differences.  There was a settlement agreement executed between the two of them in early 2025, which apparently the debtors -- the CSC-controlled debtors at the time were alleged to have breached and eventually

120

Parkview foreclosed.

I should have said this at the beginning, but Parkview, in addition to taking a leasehold mortgage it, took a pledge of the equity in the debtors and I think the Court is aware of that already.

When Parkview foreclosed, it had to conduct a commercially reasonable foreclosure sale and twice noticed up, at least twice, noticed up the UCC foreclosure sale to the world, publishing notice of the proposed auction sale and advertised openly that the equity interests in the entity that is foreclosing upon, that the entity, the tenant entity owned a leasehold interest. It didn't say a fee interest. It didn't say anything else. It didn't refer to a loan or an alleged loan.

Okay. So a few months after that, as the Court knows, Parkview directed the debtors to file for bankruptcy and a few months after that in December, the complaint was filed. Now, the reason that we think that these -- the claims in the complaint just make no sense is that the claims are contrary to the behavior of everyone who was involved in this project. It's contrary to their public statements, their recorded documents, the text of the documents themselves.

And if we go to trial, we will go through all of the factors and we are prepared to persuade Your Honor that

all of those factors favor treatment of this as a proper and typical ground lease.  Typical of a market for ground leasing that is in the -- well, I'm ill-equipped to say the exact number, but it's in the multiple, multiple billions of dollars.

And the two easy factors -- without delving into factual matters and too much into the intention of the parties -- are the lack of a prepay -- of a purchase option, which is always going to be the biggest factor.  There is nothing that Park -- that the debtors can do here, but turn over the property at the end of 99 years.  And -- and this was a third-party sale.  This is a purchase for fair value.  So, those are the two easy ones.

In the complaint, there is some time expended on trying to characterize certain other aspects as indicative of a financing.  They aren't.  For example, the tenant prepaid some rent at the commencement of the lease and that's not unusual in ground leasing.  If you don't prepay the rent, then you're just going to have to pay more rent over time and it becomes more expensive.  So that is one aspect of it.

The payments by the tenant were to the seller of the property.  The tenant also purchased personal property.  And that is, in the complaint, that is characterized incorrectly as being indicative of some kind of down payment as you would if you were a homeowner putting 20 percent down

and owning the home.  Of course, here, it was a prepayment of rent and the tenant took no equity interest at all. There's -- the tenant owns no equity in the lessor entity and it does not share in any profits that would earn -- that would be earned on the lease.

I think there's also a reference to a recovery of principal from the landlord.  The landlord invested over $170 million and, yes, it was getting a few million dollars a year, but that is a recovery that is just a few percentage points, okay.  If you do the math, it would take the landlord something like, I think it's 30 years, but I don't have the number right in front of me, in order to recover all of its principal -- all of the amount that it laid out.

So these are aspects that if we are forced to delve into the facts, we will go there.  I don't think you need to do that because of the surrounding circumstances here.  Does it make sense that everyone who's involved in this have repeatedly written and confirmed and filed documents and filed leasehold mortgage documents, published to the world, the UCC foreclosure notice saying there's a leasehold interest when, in fact, that's not true.

THE COURT:  Isn't the case law on this issue, presume that's what the parties have done?  I mean, if you look at the UAL case, it explains that this equitable estoppel theory that you posit, if you applied it to every

recharacterization, you wouldn't have a theory of recharacterization.  The idea that it was called a lease, that the parties stated it was a lease -- UAL actually says parties can testify that they intended it to be a lease, that everybody agreed it would be a lease, and the Court still recharacterized.  So, to me, that theory seems at odd with the claim of recharacterization.

MR. BRETT:  Well, the burden to recharacterize is high.  We're entitled to the presumption that it is a lease.  That has -- that's a rebuttable presumption --

THE COURT:  Uh-huh.

MR. BRETT:  -- but I think it's got to be rebutted with real facts that make sense, okay.  And we don't think it makes sense that a leasehold lender relied on this as being -- because I don't think you have leasehold lender cases there or where you have leasehold lenders that take over the equity of the debtor tenant and then argue something that is fundamentally at odds with everything that the leasehold lender has done.

But this is diametrically opposed to everything that Parkview has done.

THE COURT:  Well, there's cases out there with debtors trying to sell equipment that they've, quote, leased, right?

MR. BRETT:  Yeah.

THE COURT:  And that would be fundamentally opposed to their position prior to the bankruptcy case.

MR. BRETT:  Two things on that?

THE COURT:  Yes, please.

MR. BRETT:  One, equipment and real estate have to be treated totally separately.

THE COURT:  Uh-huh.

MR. BRETT:  Equipment does have a useful life. Real estate, really, does not.  You don't depreciate real estate.

And when you have a New York City building, buildings last a really long time.  This is not a copy machine.  And the lease has very typical provisions about maintaining the property and restricting alterations like you would see in any kind of office lease or retail lease. The -- I think it's Section 9 requires them to maintain the property.  The alterations are limited.  And then there's a specific "end of term" provision that says, you have to give us the property back in good condition.  That is not an equipment lease situation.

So, of course you have -- and I hear you, Your Honor, that people call -- that there are recharacterization cases where the document is called a lease.

THE COURT:  I think almost all of them --

MR. BRETT:  Yeah, of course.

THE COURT:  -- to be fair, I think.

MR. BRETT:  No, absolutely.  I don't think you have -- I don't think you have cases where you have the leaseholder doing what it's doing here, okay, or where you have the facts lining up like this, okay.

THE COURT:  To be clear, it's the debtor that's moving for this, correct?

MR. BRETT:  It is absolutely the debtor.

And what I'm suggesting to you, though, is -- and I appreciate that and I -- especially from the morning's comments, Your Honor -- but it --

THE COURT:  I mean, there is an independent -- there's been -- I'm not going to get into it.

MR. BRETT:  I'd rather -- yeah.

THE COURT:  That's an issue for facts --

MR. BRETT:  But you do have --

THE COURT:  -- and we don't have them.

MR. BRETT:  -- the existence of a leasehold lender and the existence of a leasehold lender that has endorsed the, specifically, the treatment of this asset as a lease. And that is, I think that is compelling, because it's not just the debtor who said it's a lease.  It's not just these two private parties in a room who agree upon how the document should be characterized; it's also the leasehold lender.  And then it was the second leasehold lender, it was Northwind,

okay, who really took the same view, signed a leasehold financing agreement.

And what do you do about the third parties who looked at the UCC notice and thought about whether or not, you know, they should show up and bid or not. What did they understand this to be?

You're -- the recharacterization effort goes against how many different parties stated unreasonable expectations in this matter? You have the debtors and you have MSP, of course, but you have everything Parkview's done, everything Northwind's done, other bidders. You have the City of New York on the deed. You have anyone who checked title and saw a leasehold mortgage is being filed.

THE COURT: And while I may agree with you that you're saying compelling things, we're at a motion to dismiss --

MR. BRETT: Right.

THE COURT: -- so, it seems to me, many of the statements that you're making are simply outside the pleadings.

MR. BRETT: Well, Your Honor, we tried to address that in certain papers because I don't think it's outside of the pleadings to say the documents signed in connection with the lease should be looked at. Everyone knows they're there. They relied on them. I don't think it's outside of the

pleadings to refer to the UCC financing publications because that's how the ownership changed and that was -- that's actually part of their complaint.  That's referenced in the complaint.  They may not have referenced the UCC financing statements or the advertisements, but they referred to the event.

So, I don't think we just turn a blind eye to, you know, the documents that are indisputable that are all part of this story and I don't think that's what the case is requiring under the plausibility standard.

THE COURT:  Okay.

MR. BRETT:  So, what does this recharacterization claim ask the Court to do?  You've got to disregard the public filings.  You've got to disregard the documents and not just one, but the leasehold financing agreement.  Is that -- are you -- is the Court going to re-examine that?  What about the leasehold mortgage, is the Court going to have to recharacterize that now?

What about the terms of the lease?  What happens at the end of 99 years?  It's our view that in 99 years, the document is clear as a bell, that property is supposed to come back, which is why we care about things like how the project is going, because it is our property.

So, those are all aspects that would need to be addressed in tax filings.  So that's why we're saying, look,

we'll try the case if you wish.  And we don't think you need to.  We think we've given the Court plenty to say this just doesn't make sense in the surrounding circumstances. Everyone thought this was a lease.  It behaves like a lease. All I have to do is look at one or two surface factors and I've got it.  It's a lease.  I think you have plenty there.

Now, without going through the details, we'll do it at trial if the Court insists.

THE COURT:  What the parties is interesting, because is that the standard under recharacterizations? Courts have said parties can agree, even structure something as a lease and they'll still recharacterize.  I read the cases and they say, yes, the testimony was that both sides agreed this would be a lease and they structured it as a lease and the Court still recharacterized.

So, to me, would it be clear error if you just relied on intent of the parties?  Is that what we're -- is that what I'm tasked with determining at the recharacterization -- at today's -- at any stage to state a claim?

MR. BRETT:  Right.  Well, a couple of things. First, I think those cases where they -- where the parties say, we want -- we mean it to be a lease involve, basically, two parties in the room, as it were, okay.  And here, I'm pointing out that you have other considerations that really

need to be taken into account.  I'm not aware of a court that addresses that as a fact of leasehold financing existence or not.  I was actually very surprised.  I thought that absolutely should be a factor in the analysis because that's what -- it's what the whole world expects, what the outside world expects.  What did the outside world expect when the UCC finance foreclosure occurred?  What was represented to them by the third parties who were not party to the agreement to begin with.

The other thing is that I think that the cases that recharacterize are so much more extreme.  They just are.  This is not the case you were referring to, but I think it's the SilverRock case where they agreed in the lease that it was a financing.  Or you have, was it the PCH case that had the entirety of the investment recovered in the first three years?  I think the Sears case was similar.  Those are not --

THE COURT:  It was Sears.

MR. BRETT:  I'm sorry?

THE COURT:  Sears was just --

MR. BRETT:  I -- yeah.

THE COURT:  It went all the way up to the Supreme Court only to come down for a party to say it wasn't a lease.  That was -- do we even -- I didn't even realize that was even an issue, so I appreciate the parties citing it because it was -- I guess it dropped off in my monitoring of the MOAC

case after we had the Supreme Court case and then all of a sudden -- but that demonstrates an interesting principle, which is that there is no statement in that case that at the end of the lease period, the debtor would own it.

The Court, there, found a prepaid right to occupy --

MR. BRETT:  Yeah.

THE COURT:  -- and the parties actually agreed that whatever the bargain was, the assignee would get that benefit, but I don't believe there was a statement that they owned it or that it was collateral of any sort --

MR. BRETT:  Uh-huh.

THE COURT:  -- which is sort of an interesting point to the prepayment.

MR. BRETT:  Yeah.

THE COURT:  But that's neither here, nor there.

MR. BRETT:  Yeah, I know, a unique case.

And these -- but all of these cases are kind of unique and have these really quirky features.  And some many of them have the purchase option, of course, or the original purchase is clearly not for fair market value and are not from third parties.  The purchase -- the original purchase is not from third parties.  So we don't have any of those.  And that's why you can look at the lease itself and see those provisions, okay.  You can look at -- and then you can look

131

at the surrounding circumstances and say, this just doesn't make sense in context when, given all the surrounding issues.

I should add something about the Fourth Amendment, too, because the predicate there is not just that the tenant was allegedly insolvent at the time, but that there wasn't fair consideration given. And, again, this is the kind of "difficult to swallow" allegation because of the surrounding circumstances. It wasn't just some dominating landlord taking advantage of some poor tenant, okay. You have Parkview as a leasehold under there, okay, standing by, negotiating this at the same time, signing on the dotted line approving the whole amendment.

Parkview didn't have to do that. If the Fourth Amendment were fundamentally unfair or sufficiently unfair to warrant a re-examination by the Court, Parkview could have said, you know what? You're not taking advantage of my tenant, my borrower here, okay. I will, instead, not approve this and I'll either cure the defaults or, you know what, I'll step in under my leasehold mortgagee rights and I'll be the tenant and I'll defend myself, okay, and I'll finish the project or what have you. Those are the rights it bargained for and it chose, instead, to say, you know what? This is actually -- this is a fair-enough deal. I'm signing off on it and I'm amending my loan documents at the same time to do it. So, in that context, it seems like it's not just the

debtor looking out for itself.  It's a third party, unaffiliated at the time, who signed off.

I don't have more in prepared remarks, but I know it's an interesting topic and I know it's an unusual fact pattern and, you know, it's certainly an intellectual exercise and the foreclosure, you know, adds a wrinkle in it that is, perhaps -- I don't know if it's welcome or unwelcome, but it's out there.  But I'll answer any questions you may have, Your Honor.

THE COURT:  I think you made it clear, thank you.

MR. BRETT:  Thank you.

MR. FAY:  Thank you, Your Honor.

Michael Fay for the debtors.  Your Honor is correct where we have -- when we have documents called leases, we have a rebuttable presumption and what we are saying in the complaint is that we think we have facts that can rebut that presumption.  And, obviously, every plaintiff is basically saying, let me go to trial, right.  Let me go to trial, let me prove this to you.

And because of that, our Rules of Civil Procedure create a relatively low bar to getting on the other side of what counsel calls "plausibility."  And I would submit to Your Honor, we have met that relatively low bar.  This is not a fraud claim, right, so we don't have the additional requirements of Rule 9.  We're dealing with Rule 8, okay.

Just a couple things. Counsel went all the way back to 2022, which really isn't that long ago, and talked about the purchase of the property. Well, if you look at the closing documents, which are attached in Mr. Brill's declaration, the purchase price of the property was $207.5 million. MSP, the ground lessor's contribution to that was 170. So MS -- the ground lessor takes the position that they own this property, but CSC Hudson paid $37.5 million of a 207.5-million purchase.

And then in January of 2023 when the tenth floor was purchased, it was $13 million. The ground lessor paid eight and CSC Hudson paid five. Well, that's not typical of a ground lease. It's not typical of a ground lease for a lessee to be actually contributing to the price of the purchase of the underlying fee. That's why we need a trial, Your Honor.

THE COURT: Well, then --

MR. FAY: Counsel might say that is perfectly typical. We say it's not. Let's have a trial and figure that one out.

THE COURT: What are we figuring out at the trial, because I take counsel's second statement he made, which is it's not clear from the complaint, which is supposed to be a noticed pleading, what you're seeking in form of your relief.

MR. FAY: What we're seeking is to have -- the

Bankruptcy Code has very, very strict rules that apply to leases, right. You have to assume or reject a lease.

This particular document called a lease, was generated in 2022, when the parties thought this project, this Hudson project was worth a lot more than it's ultimately going to be worth. It's an important project both, financially and from a socioeconomic standpoint, but it's not going to be worth what everyone thought it was going to be worth in 2022. That's reality. That happens in bankruptcy all the time. Good things, good enterprises, good businesses end up in bankruptcy because they're just not worth what people thought.

THE COURT: So you want --

MR. FAY: I want -- what we want is --

THE COURT: -- a declaration it's not a lease?

MR. FAY: -- is this to just be declared what we believe it always was, which is financing.

THE COURT: Let's stop there.

Leases -- you would agree with me, and I think the courts acknowledge, that leases are a form of financing, correct? I mean, this isn't --

MR. FAY: Yes.

THE COURT: -- a trick. The UAL case states it.

MR. FAY: I mean, I get it. You're borrowing a property, right. Correct.

135

THE COURT:  -- okay.  So you say it's a financing. That doesn't mean anything.  It is a financing.  It's a form of financing.

What you want, I think -- and it's not in the statement of the claim -- is a declaration from me stating that you own it.  That it was a sale or something else, because you haven't painted a story for me of what else would it be.  So you state a declaration -- that this is a financing.  Well, we know it's a form of a financing.  The question is, what actually was this thing, right?

MR. FAY:  Right.

THE COURT:  But then you skip and you say you want me to determine the value of the collateral.  So, implicitly, I think we're getting that you want me to determine that the debtor owns it and that, I guess, impose an equitable lien that I, then, value under 506.  None of that is in the document.

Is that what you -- is that what we're doing here, because it does not seem like that has been requested or that maybe not all of the relief that you need is in this document sought.

MR. FAY:  Right.  I think --

THE COURT:  It's very unclear what you want me to do.

MR. FAY:  I think the most important thing is a

declaration it's not a lease, subject to 365.

THE COURT:  But --

MR. FAY:  And then what it is, well, Your Honor might be right.  That's what it is; it's secured financing for a piece of property that is part of this project finance.

THE COURT:  But don't you have to request in a document, all forms of necessary relief?  Because you're not quite there in this document.

MR. FAY:  Well, I mean, I think from a pleading standpoint you don't have to, but I think, ultimately, at trial, we will have to.  I think -- we have to plead under Rule 8 that we're seeking relief and give some notice of what that relief is, which is a recharacterization of the financing.

I agree with you that at trial we have to tell you what we want completely.

THE COURT:  Well, wouldn't they be entitled to a counterclaim and ask for an equitable lien?

MR. FAY:  Of course.

THE COURT:  Okay.

MR. FAY:  Of course.

THE COURT:  But you want me to value the collateral, so it implies that you are conceding that they would get a lien.

There's no allegation in this complaint that

there's been an UCC financing statement that was filed by the lessor.

MR. FAY:  The lessor --

THE COURT:  Or excuse me -- the ground lessor.

There's no allegation that they filed anything --

MR. FAY:  No, they filed --

THE COURT:  -- like a lien.

MR. FAY:  -- a mortgage, right.  They filed a mortgage.

THE COURT:  They filed a mortgage.

MR. FAY:  Right.  Right.

And so, yes --

THE COURT:  What -- I'm confused.

They filed a mortgage?  They registered the deed.

MR. FAY:  Correct.

THE COURT:  They may have a mortgage because they needed to buy --

MR. FAY:  Right, they registered the deed --

THE COURT:  -- I don't know.  That's outside the scope.

MR. FAY:  -- and filed notice of the mortgage.

THE COURT:  Right.

MR. FAY:  Right.

THE COURT:  But they owe money to another party that's not before me.

MR. FAY:  Correct.  Correct.

THE COURT:  Okay.

MR. FAY:  Okay.

THE COURT:  Which begs the question, do we need to bring in that party as a necessary party?

MR. FAY:  The Kane (phonetic) --

THE COURT:  Because, what exactly is going to happen if I were to say that they don't own this property. You own it.  So, then, this third party lent money to them and received a mortgage?

MR. FAY:  No.

THE COURT:  So, now, they're not here.  We're doing this in absent -- they're absent.  They might want to have some say over what's happening here.

MR. FAY:  No.  Did you -- you didn't borrow any money.

MR. BRETT:  May I, just before we go too --

THE COURT:  Okay.  When I hear the word "mortgage," I think there's another party.

MR. BRETT:  Right.  No, I know.  Actually -- and this is actually a bit of a sense to your point on if we were ever to go to trial, what Your Honor would hear is that our -- my client bought the property in cash.

THE COURT:  Okay.

MR. BRETT:  We did not finance the purchase.

THE COURT:  Okay.

MR. BRETT:  That's actually -- if we get to recharacterizing, going through the details, that's actually something that would favor the finding that it is a true, you know, we own the property and it's a true lease.  So --

THE COURT:  That's helpful.  That --

MR. BRETT:  Okay.  I'll --

THE COURT:  We don't get to get into it any further, because there's no mortgage.  There's a recorded deed.

MR. FAY:  There's a recorded deed and a leasehold mortgage.

UNIDENTIFIED SPEAKER:  And a leasehold mortgage.

MR. FAY:  I'm sorry, (inaudible).

THE COURT:  And a leasehold mortgage.

MR. FAY:  And a leasehold mortgage.

THE COURT:  A construction loan.

MR. FAY:  Correct.

THE COURT:  All right.

MR. FAY:  Correct.

THE COURT:  Okay.

MR. FAY:  Correct.

THE COURT:  By my point is -- let me put a finer point on it.  There's no story in the complaint about what you think this is.  I jumped to the relief, the prayer for

relief, hoping to get some direction and it states that you want me to say it's not a release, but not say what it actually is, what you think it is.

But then I assume it must be a purchase, because you want me to value the, quote, collateral. So that implies that you own it. You financed it, and that they have a lien on it.

Is that correct? Is that your story?

MR. FAY: Yes.

THE COURT: Is that what you want to paint the picture as?

MR. FAY: That will be the most likely think we ask you to do at trial, yes it is.

THE COURT: And that's what you believe happened here is my question.

MR. FAY: Yes, I think so.

I think if you look at -- there's a project budget attached to the ground lease that was in Mr. Brill's declaration and it shows all the money. It shows the ground lessor's contribution, Parkview's contribution. Obviously, everyone was working together at this time. It even shows percentages. It shows the ground lessor having approximately 43 percent of the monies used. It shows Parkview having approximately 51 percent of the monies used. And then it shows some equity from CSC Hudson.

I mean, it -- we honestly believe that what we have here is two parties who came in, in May of 2022, and financed what was typical project finance.  And for -- one of those two documents was called a lease, but it wasn't a true lease and we think we should be able to come to trial and show that.

THE COURT:  Should I disregard the document that you cite in the complaint that was prepared by the ground lessor that has two scenarios in it, and I'm holding up what is called a compelling finance solution, which you cite in your pleading.  That seems to indicate there's two possible scenarios and one is fee-simple and one is what you did.  It seems to imply that you chose not to go with the fee-simple deal and you went with the other deal.  This is cited by your own pleading.

MR. FAY:  Right.  And I think the purpose of that, that piece of marketing material is to show you that there are benefits from doing it, doing the financing the way that is structured in their document versus just doing a straight-up fee simple.

THE COURT:  Well, there certainly is, because the project developer does not need to come out-of-pocket for purchasing the property.

MR. FAY:  Well --

THE COURT:  So there is a business.  There's a

very simple solution, which is the developer, the Smekes, to reap the value of what they wanted to take out of this project, it wasn't beneficial to them to purchase the property and have to get financing for a purchase of a property when they're also getting a purchase from a construction loan.

MR. FAY:  Well, it's --

THE COURT:  This document seems to dovetail with that understanding, that they chose not to get -- to buy the property in fee-simple.

MR. FAY:  They chose to do this financing because it had benefits, but they contributed over $40 million to the purchase of the fee.  So the concept that this is a straight-up, ground lessor bought the property, and then leased it to the Smekes, that's not true.  The Smekes -- this is a negotiated financing with monies being contributed by the lessee on each purchase.

Now, I think what the ground lease does is it reduces your annual payments, potentially, although they do begin to shoot up as the years go by, but the notion, if I were to go out and buy a two-hundred-and-seven-million-dollar building and buy it as a fee, I probably would have borrowed right about 170 million and probably would have put down, right about 37 million.  So the notion that it's significantly different than buying in the fee, I don't think

143

that's right.  I think it looks almost exactly like a purchase that the Smekes would have made buying something in fee, it was just structured differently to create other perceived benefits.

THE COURT:  Right --

MR. FAY:  But --

THE COURT:  -- because they chose to do it that way.

MR. FAY:  Correct, which is --

THE COURT:  Yep.

MR. FAY:  -- what every debtor who's recharacterizing, trying to recharacterize a lease did.  They made a decision, an affirmative decision to sign a document that says it's a lease.

THE COURT:  No, my question was, they made a decision to choose a different path.

MR. FAY:  Correct.

THE COURT:  Correct?

MR. FAY:  Correct.  They absolutely --

THE COURT:  But that does not mean it was a purchase.

MR. FAY:  It doesn't mean it was a purchase, but if -- what the case law says, Your Honor, is it's not whether it's a lease -- counsel said that a hundred times:  It's a lease -- it's whether it's a true lease and that is the

concept here.  Was this truly a lease or was it just a mechanism for coming up with a new approach to financing?

And that's really what the --

THE COURT:  To purchase.

MR. FAY:  Yes.

THE COURT:  I want to be clear.  This is important.

MR. FAY:  Yes, I understand, Your Honor.

THE COURT:  Because leases are financing tools that are utilized by all parties to maximize their return on a project such as this.

MR. FAY:  Correct.

THE COURT:  Correct.

And the document you cite seems to support the very position that this was a decision not to buy something in fee-simple, to use the lease as a financing tool.

MR. FAY:  I think we cite that to show what they're saying is there's two financial ways to go forward here.

THE COURT:  Right.

MR. FAY:  Also, the value of this, the whole purpose of a ninety-nine-year lease is to give the lessee something equivalent to ownership.

THE COURT:  I would disagree with that.  The cases have said that that's not the case.

MR. FAY:  Well, it's -- let's just say this:  it's an exceedingly long time.  It gives you time to build out your project and it gives you time to run it for decades.

THE COURT:  To recap the value --

MR. FAY:  Correct.

THE COURT:  -- that the developer wants to achieve on a project, right?

MR. FAY:  Correct.

THE COURT:  They want to achieve a certain rate of return for their investment in building out and renting these units, right?

MR. FAY:  That's correct, Your Honor.

THE COURT:  Right.  It's not -- that is different than buying -- that they're investing in purchasing this property.

MR. FAY:  The recharacterization is -- yes, it's different, but what the courts are basically saying is how different it is that a ninety-nine-year lease that looks just like ownership, right.

THE COURT:  Right.

MR. FAY:  That's -- look at the standards that the courts ask you to look at.  There's standards of ownership.

THE COURT:  I have.  I've studied those cases and it's difficult for me to see your story here.  Because those cases tell a story, based on the facts, okay, that led the

Court to the conclusion of what it was, instead of a true lease.

Here, it's as almost as if you plucked out the facts, put them in the complaint, and just said, these facts are good enough because X number of cases have relied on them.  There's not even a statement under oath or subject to Rule 11 of what you think this is.  There's no allegation in this complaint that you -- what you believe this is, a joint venture, a purchase, that we own it, this is truly a sale. That is conspicuously absent from this.

MR. FAY:  Well, Your Honor --

THE COURT:  And that might be important.

MR. FAY:  Right.  I think I would say that I think we've pled enough to meet our obligation under Rule 8.  And I think it -- I mean, I've always viewed the complaint as telling the story that this is a financing.  It's a -- and most likely a secured financing and it's not -- what it's not is a true lease.  It's not a true lease.

So 365 should not apply to it and it shouldn't be all-or-nothing.  It shouldn't be either you pay us everything that was calculated based on an unreasonable valuation of the property in 2022 or you go home and we take the whole thing. And I think the "we take the whole thing," that's -- you know, in the MOAC case, that was big for the Second Circuit. That is just -- that would be a total windfall.

THE COURT:  Well, it's because they prepaid the entire right of occupancy, so it wouldn't have been fair for the landlord to get the property that the debtor had prepaid the right to occupy for all those years.  That was the story in that case.

MR. FAY:  Yes, it was, Your Honor.

And in this case, we've got $40 million being prepaid for the purchase of the units, $40 million that was paid only four years ago to purchase these units.  And then you add on to that the money that went to, you know, the Union and (indiscernible).  There's well over a hundred million dollars invested in this property, including the purchase price of the property and it would be exceedingly inequitable to just let the ground lessor walk away with that.

THE COURT:  How could -- walk me through why the ground lessor can walk away with it.

MR. FAY:  If -- if --

THE COURT:  There's a lease.  You either -- if it is, we walk through this scenario, I disagree with you -- let's just say hypothetically, I disagree with you -- the parties are back to a lease that you can assume or reject. That's the negotiating bargained for.

MR. FAY:  It's not.  But under --

THE COURT:  Where are they walking -- what are

they walking away with?

MR. FAY:  With -- if the lease is rejected, they walk away with the whole project.

THE COURT:  Well, it's your decision to walk -- to assume or reject at that point.

MR. FAY:  But that --

THE COURT:  You state very clearly in your paragraph that you're trying to negotiate better lease terms.

MR. FAY:  Well, we're not getting anywhere then.

THE COURT:  Okay.  Well, then, why is this appropriate in lieu of trying to negotiate better lease terms?

MR. FAY:  Because it's not a true lease, Your Honor.

THE COURT:  Your own allegations seem to suggest that it's a leveraging tool.

MR. FAY:  Our allegations is that -- are that there are lots and lots of people out there in this world who come up with new and different ways to approach finance and this is one of them.  But what it's not is a true lease.

THE COURT:  But why should I, sitting here, disregard what is common marketplace for ground leases?

MR. FAY:  It's --

THE COURT:  They're legitimate.  They are legitimate tools used in the marketplace for leases --

MR. FAY:  Well, Your Honor --

THE COURT:  -- not purchases.

MR. FAY:  -- we filed expert reports yesterday that will address that exact issue, which is that this is not anything like a traditional ground lease.  This is a financing.  The way the rent is calculated, the provisions in it, the fact that the lessee contributed to the purchase price of the underlying units all make this very different than a traditional ground lease.  There are lots of ground leases in New York City.  This doesn't look like any of them.

THE COURT:  Okay.

MR. FAY:  And, again, that's really our -- this -- our whole point here is, we want to get this done.  We want to get the parties back to the table.  We want everyone to work together.  We're not trying to take anything away from the ground lessor.  We just want -- we don't want to be stuck with the rather Draconian rules that govern true leases.  And we feel that we shouldn't have to be stuck with those in this situation because this isn't a true lease.

THE COURT:  So, if I were to determine that this was not a true lease, and it seems to me that you concede in your pleadings they would have a lien, what's your position of the priority of that lien, *vis-a-vis*, Parkview?

(No verbal response)

THE COURT:  It's not stated in the pleadings.  I

mean, I'm conducting a trial that will set forth the pathway of this case and it's incomplete.

MR. FAY:  Well, maybe there isn't a lien.  Maybe no one has a lien.

THE COURT:  Well, you asked me --

MR. FAY:  And maybe there's just two --

THE COURT:  No, you asked me to value the collateral at the trial --

MR. FAY:  Yes.

THE COURT:  -- so if we're not doing that, let's get rid of that, because that's a huge deal that I have to go through.

MR. FAY:  Okay.  Well, then, maybe we don't.

THE COURT:  Okay.

MR. FAY:  Maybe we have a property with two *pari passu* unsecured creditors with an interest in it who now need to sit down and figure out what they're going to do.

THE COURT:  Well, Parkview wouldn't have an interest in it, only to the extent of the DIP -- to the extent that they --

MR. FAY:  That's correct.

THE COURT:  -- got a lien on it, which they didn't.

MR. FAY:  Right.

THE COURT:  I don't believe that they took a lien

on property that the debtor -- they didn't take a lien on the ground, the real estate.

MR. FAY:  No, they didn't.  They took a -- they had a lien on the lease.

THE COURT:  Right.

MR. FAY:  All right.  Or maybe they both have liens and their *pari passu*.

THE COURT:  Where would be -- where would the basis for Parkview's lien come from?

MR. FAY:  From the fact that it had a lien on the lease.

THE COURT:  On the leasehold interest?

MR. FAY:  Yes.

THE COURT:  Wow.

Okay.  This is going to be an interesting trial and I look forward to it.

(Laughter)

MR. FAY:  Your Honor, I mean --

THE COURT:  I would expect significant pretrial briefing on these issues.

MR. FAY:  Okay.  Yep.

Listen, I totally agree with you.  What the ultimate resolution of the issues you're raising needs to be addressed at trial and we will absolutely do that.

I think for purposes of pleading standards, I

think what we have here is sufficient to get us going, and then we'll address that at trial.

THE COURT:  Okay.

MR. FAY:  Okay.

THE COURT:  Thank you.

(Pause)

THE COURT:  I'm happy to hear from you in reply.

MR. BRETT:  Thank you, Your Honor.

So, thank you for sharing your thoughts and particularly for raising the exhibit, which was the marketing piece, because I confess that was in my outline and I neglected to mention it.  But I think Your Honor covered that point that it does, that that marketing piece only highlights that there's a distinction between the leasehold financing and, you know, buying a fee and getting traditional debtor mortgage financing and it does nothing to demonstrate that this was somehow anything other than a ground lease.

As to the -- counsel referenced a few times that money was paid by the tenant.  Leases require payments all the time.  I don't know how you buy a two-hundred-million-dollar building or take a ninety-nine-year interest with no money down, but in any event, it's properly accounted for.  And in terms of whether or not that evidenced some kind of a sale, which, again, is not in their complaint, there is, as I said in the opening remarks, there's no equity interest.

There's no right to share in our -- in the rent that we recovered.  There's no right to share in the reversionary interest.

THE COURT:  Well, and the complaint actually says that that payment was made to you, correct?

MR. BRETT:  Right.  It --

THE COURT:  Was there another -- well, this is outside the scope for the record --

MR. BRETT:  That's what the complaint says and --

THE COURT:  -- but it alleges that the plaintiffs were required to make an up-front payment to you, not to the Kane.

MR. BRETT:  It does say that.  It's not correct. And I was trying to steer away from disputing facts on a motion to dismiss.  It's simply not correct.  It went to the seller.

THE COURT:  Oh, it did go to Kane.

MR. BRETT:  It went to the seller.  It didn't go to us.

So -- and the fact that they -- and I think Your Honor put your finger on it, that they don't really know what this is and they haven't articulated what this is and what our rights would be if it's recharacterized.  We don't even know what we're litigating at trial.  We don't know what the -- we don't really have notice of what we're trying, in

effect.  But I think the simplest answer is, maybe we should just apply the words of the document.

THE COURT:  Well, I don't know if I can do that. It's against the idea of recharacterization --

MR. BRETT:  Well --

THE COURT:  -- because courts -- I mean, I think in the beginning I was probably not around for this but when parties started to argue this theory the case law suggests that that was the big argument. It says, at least, we should honor the lease, right.  And so, you can see the circuit court struggling with whether recharacterization should even be a claim.  Can you even do it because the document says "lease" and the parties proceeded on that, right.

MR. BRETT:  Right.

THE COURT:  So, the idea that you should just dismiss the claim because it says lease, I mean, I think that has been implicitly or explicitly rejected by circuit courts.

MR. BRETT:  And I found that interesting because in every other area of the law there is the parol evidence rule and theoretically, you're supposed to apply the plain language of documents and enforce them as written.  And here --

THE COURT:  It's certainly happening a lot today in issues of LMEs and, you know, that we enforce the language of the documents, right.  So, I agree with you.  This claim

is counterintuitive to what I would think we're charged with; however, it is a claim.

MR. BRETT:  It is a claim.

THE COURT:  We're here.

MR. BRETT:  We are here.  But I think one of the reasons for the plausibility standard in the first place is you have the parol evidence rule, of course, apply the plain language and then you have this, well, if the substance of the document makes it ambiguous that is when you should look at recharacterization and that is how that started as far as I can tell.

What I'm suggesting is, actually, the substance of the document doesn't make this ambiguous.  Okay, we don't have the purchase option.  We have a full reversion interest. We have everything else that is very typical of a lease. Then we have surrounding circumstances which make it apparent that it makes no sense to recharacterize this and we don't even know what we're recharacterizing it into.

So, for all those reasons, I think it's not enough to just say I'm filing a complaint called the recharacterization complaint, and I'm seeking a claim on that, and now none of the words matter.

THE COURT:  The problem is that you agreed to an expedited trial.  So, if anything, they'll seek to amend.

MR. BRETT:  Well, right.  We did agree to an

expedited trial because we were trying to put this issue to bed.  They wanted the expedited trial as well.  We thought we were being accommodating in that regard.  We were trying to have the trial simultaneously with their deadline to assume or reject, which --

THE COURT:  I miscalculated then.

MR. BRETT:  Well, the first day of the trial was going to be the day before their deadline to assume or reject.

THE COURT:  Okay.  I appreciate your efforts. I think what I'm struggling with is we're at a motion to dismiss.  So, you know, yes, I have dismissed highly factual claims at the motion to dismiss stage. I would submit I stand by my decision to do it at least one time and wrote a 65-page opinion as to why it was appropriate and I had the benefit of 10 years of prior litigation between the parties.  And I denied the motion for leave to amend because of the extremes of that case.

You know, we're new. The idea that I wouldn't let them -- we're new to each other.  The idea that I wouldn't let them amend is a difficult pill for me to swallow.  So, we really just would be where we are with -- they would be maybe permitted to amend and we have an expedited trial down the road.  So, just procedurally we're in a little bit of a quandary admittedly.

So, while I may agree with some of your arguments, procedurally we're on the path to an expedited trial, it seems.  I worry though that in typical litigation you would counterclaim for what you would want.  Perhaps you would have counterclaims against the debtor.  You would seek an equitable lien if you lose or you would do certain things that puts us all in a good procedural posture for teeing up a trial, having the justification that I would need to enter those rulings.

I fear that is going to be missed given the urgency here. I would expect the parties, if you don't settle at mediation and I don't have the opportunity to rule on this, would have to come to some agreement to make the trial work; otherwise, I fear that I'm only partly resolving this dispute and that would be wildly inefficient of my time.

So, this is off topic but if I don't get to this you will have to work together. I don't want to hear arguments like, oh, you know, I am not letting them seek a lien at trial.

MR. FAY:  We would never say that and there is no reason, Your Honor, that prior to trial we can't work these issues out.

THE COURT:  Okay, because there's missing components to requests for relief.

MR. FAY:  No, there was no -- I mean, we could

just make an agreed stips before trial.  There is no reason we can't.

MR. BRETT:  I don't mind telling you, Your Honor, counsel have been getting along, okay.  We've had depositions, we're all getting along.  We have had one disagreement so far and that is the D. Simone report.

(Laughter)

MR. BRETT:  Sorry, did I say a bad word?

THE COURT:  Actually, didn't you settle that for purposes of -- there were two D. Simone reports disputes and one of them was settled last week, it seems.

MR. BRETT:  We called for the production of the final report and documents relating to that.  And that was -- but we're perfectly civil, don't get me wrong.  We just have a disagreement about it.  In terms of coordinating things, we will get along.

THE COURT:  Okay.  I didn't mean to cut you off.

MR. BRETT:  I am not really sure where I was after that.

THE COURT:  Again, you got a hot bench today and I apologize.

MR. BRETT:  I think I've said enough, Your Honor, unless you have questions. I am not looking to belabor the record. I think we understand where we're heading.

THE COURT:  Okay.  Thank you very much.

As I mentioned, you're headed to mediation. I am not going to do anything that is going to disrupt the playing field as you all head into mediation.  I am not ruling on this today.  The problem is, is that you mediate, what is it, one day you're all going for one day?

MR. BRETT:  We have something like, I think, eight or nine depositions in advance of the mediation.

THE COURT:  Okay.

MR. BRETT:  That is the next week and a half going into mediation and then we have one day on May 1st.

THE COURT:  One day session.  Okay.  As soon as the parties are able, and you feel comfortable, I want you to jointly email Chambers and tell me it was successful, it wasn't. If it wasn't we're going forward because then I'm going to decide whether I want to rule on these issues prior and how do I want to handle it or if I just remain silent and we head to trial because at this point, we're two weeks away, the week before Memorial Day or, whatever, three weeks before trial.

MR. BRETT:  Yes.  It is before Memorial Day.  It's the Friday before Memorial Day.

THE COURT:  Right.  Admittedly, I probably wouldn't have scheduled this oral argument if I knew you were headed to mediation just because it doesn't make any sense because we're only three weeks out but I'm going to give real

thought to the points that you raise because I'm not in the interest of -- I'm not in the market of conducting trials on implausible claims if I were to determine its implausible, but as I said would it really lead to anything productive if I will let them try to amend.

So, I am going to think it all over and you will report back on the status of the mediation or perhaps Judge Gerber was supposed to do that, I'm not sure.  So, whoever is supposed to be reaching out to me should reach out to me so that we understand and then I will make a decision on how to move forward. If you hear from me then I am going to rule and if not, I will see you at trial.

MR. BRETT:  Okay.  Absolutely.

THE COURT:  With respect to the open issue on the committee's letter, I'm taking that under advisement.  I will report back when I think it's appropriate.

Thank you.

MR. BRETT:  Thank you, Your Honor.

THE COURT:  We will stand adjourned.  Thank you for your time.

(Proceedings concluded at 2:58 p.m.)

CERTIFICATION

We certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter to the best of our knowledge and ability.


/s/ William J. Garling                    April 23, 2026

William J. Garling, CET-543

Certified Court Transcriptionist

For Reliable


/s/ Mary Zajaczkowski                    April 23, 2026

Mary Zajaczkowski, CET-531

Certified Court Transcriptionist

For Reliable


/s/ Coleen Rand                    April 23, 2026

Coleen Rand, CET-341

Certified Court Transcriptionist

For Reliable